COCA–COLA CO. v. CARLISLE BOTTLING WORKS.

District Court, E. D. Kentucky.
Jan. 14, 1929.

Allen, Botts & Duncan, of Lexington, Ky., and Candler, Thomson & Hirsch, of Atlanta, Ga., for plaintiff.

Leslie Morris, of Frankfort, Ky., for defendant.

COCHRAN, District Judge.

This suit is before me on final hearing. On the hearing of the motion for a preliminary injunction I delivered a written opinion denying the motion, which has been published in 20 F. (2d) 909.

The sole complaint of the plaintiff is of infringement of its trade-mark "Coca-Cola." This trade-mark is a compound word and does not consist of two separate words. This is due to the hyphen which connects the two words which make it up. In the former opinion, in presenting defendant's trade-mark, of which complaint is made, I gave it as a compound word, to wit, "Roxa-Cola." This was a mistake. It is not a compound word. It consists of the two separate words, "Roxa" and "Cola." They are not connected by a hyphen. Its trade-mark is "Roxa Kola." At the outset I would emphasize the fact that the plaintiff's complaint is limited to infringement of its trade-mark. No complaint is made that the dress of defendant's article resembles that of plaintiff. It was conceded in argument that it does not. The facts do not permit of its being claimed otherwise. There is no similarity in the bottles used by the defendant with those used by the plaintiff. They differ distinctly in shape. The plaintiff's bottle seems to be patented and the question of its infringement was involved in the case of Coca-Cola Co. v. Whistle Co. of America (D. C.) 20 F. (2d) 261, 955. It was held there that there was no infringement, in that the similarity between the two bottles was not such as to deceive ordinary observers or would-be purchasers.

The difference between the two bottles here is more striking than there. On defendant's bottles there is blown into and around it just below the neck the words "Carlisle Bottling Works, Carlisle," and on the end "Carlisle, Kentucky." There was a similarity between the caps of the two bottles, of which note was taken at the hearing on the motion for a preliminary injunction, in that the trade-mark on each was the same color, to wit, red. No complaint of this was made in the bill. It was pointed out at the hearing, when I expressed a disapproval of this similarity. It was at once removed by changing the color of the trade-mark on defendant's caps to blue. And apparently this change has put an end to this complaint so far as there ever was one. So much as to the container. As to the article itself there is a distinct difference. Each uses caramel. The plaintiff claims that the use thereof is limited to coloring the article; that it has no other function. The defendant claims that it has also a laxative effect. But, however this may be, the two articles differ distinctly in color. The color of plaintiff is light and rather transparent. That of defendant is dark and opaque. It is a much deeper tint. When we come to the immediate setting of the two trade-marks, we find a distinct difference. The plaintiff's compound word is in large red letters in script, on a white background, and presents in appearance a unique design. The defendant's two words are in large blue letters, not in script, on a gray background. The plaintiff's compound word has above it the words, "Minimum contents 6 fluid ozs.," and below it, "Reg. U. S. Pat. Off." Defendant's two words have above them the words, "More than wet," and below them the words, "Trade Mark," and a small insignia. As already indicated, the two trade-marks themselves differ distinctly, in that plaintiff's consists of a compound word, whereas defendant's consists of two separate words. The first part of plaintiff's compound word is "Coca." The first part of defendant's two words is "Roxa." These two

words differ in appearance and in sound. The "o" in plaintiff's word has the sound of "o" in coke. That in defendant's words has the sound of "o" in fox. The noticeable resemblance of the two trade-marks is between the second part of plaintiff's compound word, to wit, "Cola," and the second of defendant's two words, "Kola"; the resemblance to the ear being exactly the same, but to the eye it is not exactly so, in that the letter "K" is substituted for the letter "C."

I diverge here to give the history of the use of defendant's trade-mark. It was not originated by defendant. It was originated in 1906 by C. L. Wainscott of Winchester, Ky., which is within forty miles of Carlisle, defendant's headquarters. He then began the manufacture of the article at that place and to put it on the market under the name "Roxa Kola" and has continued so to do ever since. On August 10, 1909, he had the first word "Roxa" registered in the United States Patent Office. He did not have the two words registered, because he was advised by his attorney, who had the matter in charge, that the word "Cola" was not registerable, in that it was descriptive. His market is limited to a few counties in Eastern Kentucky, not far from his base at Winchester. Seemingly he sells his goods direct to the retailer in his own county of Clark and the counties of Montgomery, Bath, Rowan, Powell, and Madison, adjoining Clark, or not far away. In addition, he sells his article to concerns who bottle it and sell it to the retailer. There is reference in the evidence to a bottling company at Irvine, county seat of Estill county, which handles that county and the adjoining county of Lee, and to such a company at Georgetown, county seat of Scott county, and Cynthiana, county seat of Harrison county. The defendant is such a company located at Carlisle, county seat of Nicholas county. Its territory covers that county and parts of the counties of Bourbon, Robertson, Fleming, and Mason, all of which, except Mason, adjoin Nicholas. Wainscott's trade thus covers about fifteen counties in Eastern Kentucky, all of which are in close proximity to Clark county at the county seat of which he produces the article. It would seem that in all instances other soft drinks besides' Roxa Kola are handled by the concerns handling it. The defendant has been in business continuously since 1911, i. e. for more than fifteen years before the bringing of this suit. Wainscott has done all the advertising of the article on behalf of himself, subsidiaries, and retailers. This advertising has been intensive, if not extensive.

He has resorted to all sorts of devices to bring his article to the notice of the public, such as chain hangers, water drinking cups, tags, caps, fans, buttons, and whistles called Roxa Kola whistles. On the whistles is inscribed the words, "Something to blow about, drink Roxa Kola, more than wet, puts steam in your whistler." The article has been advertised on all billheads issued by him and subsidiaries, also by handbills, labels, pamphlets, local newspapers, and some magazines. Songs have been put out advertising the article. This one was circulated in 1913, to wit:

"Now listen boys a mystery to you I want to
    tell
Cause when you call on your best girl
Of course you want to look swell.
Drink all the Rox Kola you can get and
    your beauty I'll insure
You will capture every girl you meet
Your rivals will be fewer."

Chorus:

"Oh, its Roxa Kola dope,
It gives a body new hope
Things don't seem the same,
When a glass you've drained.
Try it, buy it just for a change.
When once you tried that sparkling drink
Ever more you'll think of the same notion
And drink of your portion of Roxa Kola
    dope."

This one in 1916 or 1917:

"Ashes to ashes, dust to dust
If cocaine don't get you, Roxa Kola must."

Much use has been made of signs in bringing Roxa Kola home to the public. In 1909 he tore down his original plant and built a four-story building, including basement. Delivery was then by wagon. A picture of the original plant and delivery wagon was introduced in evidence with Roxa Kola signs all over them. Since 1912 deliveries have been by truck operated by Wainscott and by the subsidiaries. The trucks all have a Roxa Kola sign on them, and such signs are placed on the plants of all the subsidiaries and along the highways. In 1910 Wainscott organized the Kentucky State Bottlers' Association, and there has been an annual meeting of the association ever since. At those annual meetings he has maintained a booth at which he has displayed his article in connection with Roxa Kola signs. The printed proceedings of the association has carried a full page advertisement of Roxa Kola. He had a booth at the National Bottlers' Exposition in 1914 where he displayed and advertised his article. He testified that he had sent Roxa Kola in

small lots or with orders to practically every state in the United States. But there is no indication of any sustained business being transacted elsewhere than in the fifteen or so counties heretofore referred to. The pains taken to differentiate Roxa Kola from Coca-Cola in matter of dress, setting of trade-mark, and in the trade-mark itself, and the advertising which has been resorted to, rebuts the idea that there has been any purpose or intent on the part of those handling it to pass it off for Coca-Cola. It is indicative of a good-faith effort on their part to secure business on the merits of the article itself without deception of any one. This is fortified by the fact that, notwithstanding such advertising, the article has made little headway. Wainscott seems to have been able to secure no business outside of Kentucky and none in Kentucky outside of the few counties heretofore named. The business he has secured there may be accounted for to a certain, if not large, extent by local interest and pride in him and his subsidiaries. One is justified in acting on the idea that such has been the view which plaintiff's distributors affected by Roxa Kola, if not itself, have taken of the matter.

It would seem that plaintiff does not distribute to the consumer at all, and that, if it distributes to the retailer, it is only to the proprietors of drug stores. Its main avenue of distribution is through subsidiary bottling companies under licenses or some other form of contract. During the time that Roxa Kola has been on the market, the distribution of plaintiff's article in Kentucky, at least in that part of the state affected by Roxa Kola, has been handled by Charles Mitchell, whose home and plant is at Lexington, eighteen miles from Winchester, where Wainscott has his plant. The distribution of its article in its home state of Georgia has been in the hands of Charles V. Rainwater, whose office is in Atlanta, plaintiff's headquarters, and in the Candler Building, the same building as that in which plaintiff's attorneys, Candler, Thomson & Hirsch, to whom all complaints come in regard to infringement of plaintiff's rights and who have had charge of all litigation in protecting its rights for many years, have had their office. Just how far the plaintiff maintains scouts to investigate and run down infringements does not appear. The evidence herein to be referred to later shows that it maintains scouts to ascertain how far persons suspected of engaging in unfair practices are really guilty thereof. It is not unlikely that it may have general scouts who have a broader field. But it would seem to

be certain that it depends to a large extent on its distributors to keep it posted as to any infringement of its rights. These distributors have an interest in putting a stop to such infringements and incur no expense in the bringing of suits to bring this about. The plaintiff looks after that matter exclusively and bears all the expenses. I gather this from the fact that in the numerous suits which have been brought in the federal courts to protect its rights which are reported in the Federal Reports, they have in all cases been brought by it. In no instance has a distributor been a party to the litigation.

Now the evidence justifies the conclusion that at least Mitchell of Lexington, whose business has been affected by Roxa Kola, knew of Wainscott's business and that of his subsidiaries from the very start. He and they have been in direct competition and their respective trucks cover possibly almost daily the same territory. It is not unlikely that Rainwater, who may be more or less a general scout of plaintiff, has known of it also. Wainscott testified that Mitchell knew of Roxa Kola and its business and that he felt sure that Rainwater knew of it also "all the time." This evidence was uncontradicted. That there was positive friendliness between Mitchell and Wainscott is shown by a picture introduced in evidence of Mitchell in Wainscott's booth at the National Bottlers' Association in 1914 with Wainscott and his wife and with Roxa Kola signs all around him. April 12, 1922, plaintiff's attorneys got hold of a label that defendant was using and of an advertisement of Roxa Kola in a magazine put there by Wainscott, but they were not led to take any action by reason of such notice. Plaintiff has never made any complaint of Wainscott or any other distributors except defendant. The first complaint which it made of defendant was in February, 1923, and that complaint seems to have been the outcome of a squabble between Mitchell and defendant as to getting their empty bottles mixed. Two agents of plaintiff claimed to have been furnished Roxa Kola for Coca-Cola by two retailers of Carlisle, who handled defendant's products; they having been sent there for the purpose of ascertaining whether defendant's product was being so sold. This happened February 2, 1923. On February 7, 1923, plaintiff's attorneys wrote defendant concerning the matter. They stated that plaintiff's attention has been brought to the fact that it was "using a crown bearing the word 'Roxa Cola'" and that some of the retailers in its vicinity were "substituting your product as and for Coca-Cola on calls

for Coca-Cola." The reference to the use of the word "Roxa Kola" indicates that it was had in mind to complain of infringement of plaintiff's trade-mark, but the rest of the letter is devoted to a complaint of unfair competition by substitution. Besides the next sentence negatives that there was any such complaint. It is:

"Consumers cannot see a crown which is pulled off before the bottle is set before them and, often, upon their call for 'Coca-Cola' they receive your product, although they believe they are getting Coca-Cola as manufactured by the Coca-Cola Co."

This was as much as to say that if the consumer could see the crown with the words "Roxa Kola" on it he would not be deceived and there would be no ground for complaint. The letter then proceeds:

"State and federal laws very plainly state that if you bottle and sell a beverage, even under some name you select, and such beverage later be used by some retailer as a substitute for another product you may be held liable for contributory infringement and consequent damages.

"We take the liberty, therefore, of suggesting to you that all dealers to whom you sell refrain from dispensing your product as and for Coca-Cola and we further suggest you discuss the matter with your attorneys, asking them to show you the Gay-Ola Case reported in (C. C. A.) 200 F. 720, and also the Garrett Case, reported in (D. C.) 256 F. 943."

The complaint in the Gay-Ola Case was of dress and substitution, and whilst in the Garrett Case it was claimed and held that "Virginette" was an infringement of "Virginia Dare," the stress was on dress and substitution. It is to be noted that no reference is made to the decisions in the cases of Coca-Cola Co. v. Duberstein (D. C.) 249 F. 763; Coca-Cola Co. v. Old Dominion Beverage Co. (C. C. A.) 271 F. 600; Coca-Cola Co. v. Chero-Cola Co., 51 App. D. C. 27, 273 F. 755, the latest of which had been rendered nearly two years before, in which certain words were held to be an infringement of plaintiff's trade-mark, to be considered more fully hereafter. The sole complaint here is of substitution. What they call for is that the retailers quit substituting. Apparently plaintiff's attorneys would have been satisfied with this. There is no call that defendant and the retailers quit using the words "Roxa Kola."

There then follows, however, this sentence:

"We also invite your attention to the attached copy of a recent decision of the Supreme Court of the United States upholding the 'Coca-Cola' trade-mark."

Reference is here had to the decision of that court (254 U. S. 143, 41 S. Ct. 113, 65 L. Ed. 189) so upholding and holding further that the word "Koke" was an infringement of plaintiff's trade-mark and that the word "Dope" was not. The letter concludes:

"We trust this matter can be amicably adjusted and without litigation. Awaiting your prompt reply as to your intentions, we are."

The defendant answered this letter February 26th following. It amounted to a denial of substitution in most emphatic terms and called for further information. It concluded:

"We, therefore, trust you will give us such information as will assist us in co-operating with you and your clients. As we assure you that it will be our pleasure to correct any misrepresentations that have been or may be made."

Plaintiff's attorneys, not having heard from defendant promptly in answer to theirs of 7th inst., before the receipt of its answer of the 26th, on the 27th wrote defendant again:

"On February 7th, we wrote you relative your use of a crown bearing the word 'Roxa Kola' but up to the present time have heard nothing from you. Kindly let us have answer to that letter."

On March 2, 1923, plaintiff's counsel answered defendant's letter of February 26th. They first gave the more definite information called for by defendant. They said:

"We beg to advise that on February 2, 1923 at about 11.55 o'clock A. M. a customer entered Flora Grocery at Main & Maple Streets in Carlisle and called for Coca-Cola. Without explanation clerk calmly served Roxa Kola, your product. Also on February 2nd, 1923 at about 12.10 o'clock P. M. a customer entered Robert W. Neal's Bakery in Carlisle and called for Coca-Cola. Without explanation Mr. Robert W. Neal calmly served Roxa Kola, your product."

The customer referred to who made these purchases was an agent whom plaintiff sent there to make them. After giving this information, plaintiff's attorneys presented a case solely of infringement of trade-mark. They said:

"The following have been held to be infringements; Carbo Cola; Ceiro Kola;

Chero-Cola; Citra-Cola; Kaw-Kola; Kel Kola; Co-Co-Lan-A; Koke; Mitch Cola; Penn Cola; Prime Cola; Queen Kola; Silver Cola; Soler Cola; Tenn Cola; Tribo (Genuine Coca and Cola Davo) and King Cola.

"In the case of The Coca-Cola Company v. Duberstein, 249 Fed. 763, the court said: The odor of fraud is difficult to remove. This case reeks with it. Why does the defendant use the word 'Cola' at all? The only purpose is to appropriate a part of the value of complainant's trade mark and good will. El Cola is in itself an infringement of complainant's trade mark Coca-Cola.

"In the case of the Coca-Cola Company v. Koke Company of America tried in the Supreme Court of the United States, 254 U. S. 143, 41 S. Ct. 113, 65 L. Ed. 189, the trade mark 'Coca-Cola' was held to be valid.

"Furthermore we call your attention to the case of Coca-Cola Company v. Old Dominion Beverage Company (C. C. A.) 271 F. 600, where Coca-Cola was again held to be a valid trade mark and Taka-Kola an infringement thereof. This was tried by the United States Circuit Court of Appeals for the Fourth Circuit. We also call your attention to the case of Coca-Cola Company v. Nashville Syrup Company (C. C. A.) 215 F. 527, Ann. Cas. 1915B, 358, wherein Coca-Cola was held to be a valid trade mark and Fletcher's Coca-Cola an infringement thereof. It is a case of the Circuit Court of Appeals of the Sixth Circuit. The question involved is, is Roxa Kola a colorable imitation of Coca-Cola? That is, is it likely to cause confusion? If so is it an infringement? We have tested this matter out and found not only that it is likely to cause confusion, but that it has caused confusion in the minds of your own distributors. We have this evidence before us. We will be glad to hear from you in the premises."

On the same day, i. e. March 2d, the defendant answered the letter of plaintiff's counsel of February 27th. It said:

"We were surprised on receiving your letter of the 27th, as we had written you fully in regard to this matter in substance as follows. First that we do not believe that the reason given in your letter of February 7th was the real reason for this complaint. As we knew that the facts in the case do not bare out the accusation made and also that we are as anxious as the Coca-Cola people to have no misrepresentation and asked for the names of parties selling Roxa Kola for Coca-Cola. Our position is still the same as

set out in our previous letter which you have no doubt received by this time. And until you give us the information asked for we cannot get at the parties doing the thing of which you complain. If there are any doing it and you will give us the names they will not do it again with our goods. Hope you will soon answer with the desired information."

The defendant on March 5th answered the letter of plaintiff's counsel of March 2d, giving the information called for by defendant in its letter of February 27th. It had this to say as to this information:

"On February 2nd a driver or helper on the truck of the Coca-Cola Bottling Co. of Lexington went into the store of Flora & Son, Main Street, Carlisle, Kentucky, about noon, also into R. W. Neal's Bakery (knowing they did not sell Coca-Cola) in one place called for a 'Coke' and in the other for a 'Dope.' They gave him Roxa Kola."

Further it said:

"He did not call for Coca-Cola but for 'Dope' and 'Coke.' "

Concerning this conduct on the part of Flora and Neal it said this:

"This could not have been perpetrating a fraud when the men knew positively that these men did not sell Coca-Cola as the truck of the Lexington Company delivers all of the Coca-Cola sold in Carlisle. These men not suspecting a trap and having nothing to conceal did what any other new man in business would have done. Besides all of the Roxa Kola as well as the other drinks put out by us are in our own bottles, the name Carlisle Bottling Works, Carlisle, Kentucky being in the glass, both on side and bottom of the bottle. This alone was enough to let the man know what he was getting, besides in Mr. Flora's place the bottles are opened on the edge of the counter facing the customer and he could not help seeing the Roxa Kola crown on the bottle. In Mr. Neal's place there is a sign reading 'We sell Roxa Kola, made in Carlisle, Ky.' so there are three good reasons that this man could not be laboring under a misrepresentation; First, he knew that they did not handle Coca-Cola; second, the bottle was branded Carlisle Bottling Works; Third, he could see the crown in one place and in the second place the sign. Also we might add both of these men are good reliable citizens."

The letter then deals with the matter of a controversy between defendant and the Lexington Bottling Works, handling plaintiff's goods, who evidently was the "informant" re-

ferred to by defendant in its letter of February 26th, as to confusion of the empty bottles of the two concerns, which matter it is not necessary to quote, and is evidently what the defendant had in mind when it said in its letter of March 2d that it did "not believe that the reason given in your letter of February 7th was the real reason for this complaint."

The defendant concluded this letter of March 5th with these words:

"As we know the standing of Mr. Neal and Mr. Flora in this city, we would be glad to have an investigation of the transaction of February the 2nd. We know that their word would go much farther in court here than any hired witness the Coca-Cola Company could produce. There is enough business for all good drinks. If Coca-Cola is a better drink than we can put out we will abide the decision of the consumer and not kick. If we are making a better line of drink than the Lexington Company and can get the trade (which is the real cause of all this) they should do likewise. We still abide by our letter of 2–26–23 and will do all in our power not to have any misrepresentation of goods and will not resort to tricks and chicanery to trip any one because our goods does not justify the business. The citation you refer to does not apply to this case at all. They are to show infringement on patent rights. This is a case of fraud to uncover fraud and a failure at that as no fraud was intended or perpetrated."

Here is an express denial of infringement of plaintiff's trade-mark. On the next day, March 6th, the defendant wrote plaintiff's attorneys a supplementary letter. It dwelt quite in extenso upon the controversy between it and the Lexington Bottling Works as to confusion of empty bottles and concluded with these words:

"We plead not guilty to any misrepresentation on the part of both Mr. Flora and Mr. Neal and will say if we believe they did misrepresent as your man says they did we would not sell them any more of our goods."

On the same day, i. e. March 6th, the defendant took the matter up with Rainwater, with whom it had in some way or connection become acquainted and whom it thought to be representative of the plaintiff. He seems to have been only the secretary and treasurer of the Coca-Cola Bottling Company, without limitation in its title, but which had its office in the same building as plaintiff's attorneys in Atlanta, Ga., had its quarters. It wrote him as follows:

"Knowing you are a busy man, we may be asking too much of you, but knowing at the same time of your fairness as president of the A. B. A. (likely American Bottler's Association) we would like for you to have Candler, Thompson and Hirsch, Attorneys for your company, to show you all the correspondence with us, including our letter of this date, regarding the use of Roxa Kola or as they term a misrepresentation of goods."

On March 9th, plaintiff's attorneys answered defendant's letter of March 5th in these words:

"Replying to your favor of March 5th, we beg to advise that we know nothing of the truck driver to whom you refer. Reliable witnesses say 'Coca-Cola' was ordered and something else was served. The Coca-Cola Company welcomes fair competition but resists in the courts, if necessary, all unfair competition. Where a person desires and wants to receive Coca-Cola he should receive same no matter whether he calls for same by the name of Coca-Cola or some nickname. Kindly refer to last paragraph of our letter of March 2nd and let us hear from you."

The paragraph referred to was in these words:

"The question involved is, is Roxa Kola a colorable imitation of Coca-Cola? That is, is it likely to cause confusion? If so it is an infringement. We have tested this matter out and found not only that it is likely to cause confusion, but that it has caused confusion in the minds of your distributors. We have this evidence before us."

Thus closed the correspondence between the parties, i. e. plaintiff's attorneys and defendant. That it thus came to an end is to be accounted for in but one way. That way is that Rainwater, pursuant to defendant's request in its letter to him of March 6th, saw plaintiff's attorneys in regard to the matter, communicated a proposition from them to defendant, and defendant complied with that proposition as shown by letter from Rainwater to defendant of date March 16th, and letter from defendant of March 31st to plaintiff's attorneys. In his letter of March 16th Rainwater stated that he had had a conference with plaintiff's attorneys "in regard to the correspondence which they have had with you covering certain practices in your city." He then proceeded to say:

"It appears from this conference that the complaint of Messrs. Candler, Thompson & Hirsch in behalf of their client is because of unfair competition due to the practice of certain dealers in your city substituting your

product for Coca-Cola and further they have evidence which indicates that you yourself have filled orders with your product when called for (No such evidence has been introduced). It appears from your correspondence that you are under the impression that the evidence gathered by Messrs. Candler, Thompson & Hirsch has come to them through some competitor. This I find is not the case. The evidence they believe is bona fide and was secured in a very reliable manner. I feel that if you can assure Candler, Thompson & Hirsch that no further practice of this kind will be permitted by you in your own plant and that you will use every effort in discouraging the dealers in doing so, that you will have no further difficulty. You must realize that when you put into the hands of dealers a product that enables him to unfairly compete with Coca-Cola, you are a party to the transaction. I trust that you will consider this matter very carefully and if you can write a letter of assurance to Messrs. Candler, Thompson & Hirsch on these points for unfair competition, I believe that you will not have any further difficulty as stated."

Thereupon defendant wrote to plaintiff's attorneys its letter of March 21st. It purports to be a response to a letter from them of March 19th. It is not unlikely that after Rainwater's conference with them they did write defendant on that date. But no such letter has been introduced in evidence. I take it then that the reply is to plaintiff's attorney's letter of March 9th. It said:

"Roxa-Kola is put out in a distinctively shaped and labelled or branded bottle. And we do not nor never have at any time put out any drink that could be mistaken for Coca-Cola nor could be a substitute or imitation for it. We have many of our syrups (orange smash and others) made at Birmingham, Ala. We do not know what is in these syrups except what the manufacturers tell us and they are put out under the name they give and not as a substitute or imitation of or for anything else. We have fully explained our position both to yourselves and Mr. Rainwater of the Coca-Cola Co. And are and always have been opposed to substitution or misrepresentation and as yet feel confident that if such has been done it was not by our plant nor by our dealers."

There can be no question but that plaintiff's attorneys accepted this letter as containing the assurance called for by Rainwater in his letter of March 16th and thereupon dropped the matter. It was an amicable adjustment thereof without litigation,

which plaintiff's attorneys expressed a desire to bring about in their letter of February 2d. There is no other way to account for it. Defendant's letters to them ring with sincerity as to their being opposed to any misrepresentation on their part or on the part of the retailers to whom it sold its product and if it could help it it would have no such misrepresentation. As further indication of this is the fact that immediately thereafter it changed its signs placed in its plant and above the ice boxes of the retailers which signs have been maintained ever since. Up until then those signs read, "We sell Roxa Cola made in Carlisle." The new signs read, "We sell Roxa Kola only."

The words "We sell" appeared above the words "Roxa Kola" and the word "only" below them. The words "We sell" and the word "only" were in large letter, and the words "Roxa Kola" were in large letters between them. Beneath the words "Roxa Kola" were the words "more than wet" which always accompanied them. This was an acquiescence, at least, by plaintiff's attorney in the continued use by defendant of the words "Roxa Kola" as a trade-mark, and I know of no reason why plaintiff is not bound by their action. This is all that need be said for the present in regard to the history of the use of the words "Roxa Kola" as a trade-mark and of the sale of defendant's product. In July, 1925, something else transpired to which reference will be made hereafter. I now proceed to a consideration of the question whether defendant's trade-mark consisting of two words is, in and of itself without more, and in view of its association, an infringement of plaintiff's compound word constituting its trade-mark. The reports are full of decisions dealing with the question, in particular cases, whether there has been an infringement of a trade-mark. It is frequently said that each case must depend upon its own circumstances. Yet I cannot see why decisions in other cases may not be helpful in disposing of a particular case. They yield general principles and, in advance of their consideration, it is to be expected that certain of them will be found to be substantially or fundamentally alike and hence subject to classification, so that, if the case in hand belongs to a particular class, the decisions covering cases belonging to that class will be persuasive as to how it should be disposed of. Many such decisions are to be found in the Federal Reporter. Plaintiff's attorneys cite twenty-nine of them on behalf of plaintiff. Defendant's attorneys cite sixteen in its behalf. I purpose to confine my

consideration of decisions in other cases to those so cited. I am struck with the fact that, usually at least, in so far as the opinions cite decisions in other cases, they are cases where the result was the same as that in the case in hand. Very slight, if any, reference is made to those in cases where the opposite result was reached. Such cases, more or less, call for differentiation. I do not purpose to go through either set one by one. I will simply refer first to certain general principles to be gathered from both sets, and then, particularly to the decisions in certain of the cases with which this case may be classed. Identity between the two trade-marks is not essential. Substantial similarity is all that is required. Substantial similarity may be in appearance or in sound, or in both. But it is not essential that there be similarity in either respect. It is sufficient that each expresses an idea or thought and there is substantial similarity between the ideas or thoughts so expressed. Three cases of this kind are amongst those cited by plaintiff's attorneys, to wit: National Biscuit Co. v. Baker (C. C.) 95 F. 135; American Lead Pencil Co. v. Gottlieb & Sons (C. C.) 181 F. 178; Wonder Mfg. Co. v. Block (C. C. A.) 249 F. 748. In the first case, "Iwanta" was held to be an infringement of "Uneeda." Each expresses the idea of the purchaser's personal comfort. In the second, "Knoxall" was held to be an infringement of "Beatsall." Each expresses excellence. In the third one, "Wonder" was held to be an infringement of "Wizard." Each expresses the idea of surprise.

In making the comparison it is not sufficient to place them side by side. It is not visual comparison that is called for. What is called for is memory comparison—the similarity of the alleged infringing trade-mark to be the infringed trade-mark as the purchaser recalls it in his memory.

In making the comparison analysis of the two trade-marks into their ultimate elements is discouraged, if not denied. The would-be purchaser does-not analyze. The question is how do the two trade-marks appear to him as a whole. In the case of P. Lorillard Co. v. Peper (C. C. A.) 86 F. 956, 958, it was said:

"Elaborate descriptions of the points of resemblance or those of difference are, taken by themselves alone, always unsatisfactory. The eye, at a glance, takes in the whole of one exhibit and the whole of another; and the comparison thus made of the two is the surest, and the only satisfactory, way of satisfying the judgment as to the existence of the alleged deceptive imitation."

That was a case of unfair competition. But what is said applies equally to cases of infringement of trade-marks. In each case it is the tout ensemble that counts. And, in the case of infringement of trade-marks, it would seem that the whole to be taken into consideration, at least so far as appearance is concerned, is not the trade-mark in and of itself, but in its setting and also the dress of the article to which the trade-mark is affixed. The ultimate question is whether there is such similarity that it is calculated to deceive the ordinary purchaser. It is not necessary that there be any evidence of actual deception. But the absence of such evidence is relevant to the question of similarity. In the case of A. J. Krank Mfg. Co. v. Pabst (C. C. A.) 277 F. 15, 19, it was said:

"While proof of actual deception is not essential, the lack of proof thereof may properly be taken into account, in connection with the appearance."

If the similarity is such as to be calculated to deceive the ordinary purchaser, it is not essential that there be an intent on the part of the infringer to deceive.

In 26 R. C. L. p. 874, it is said:

"At common law a fraudulent intent was regarded as necessary to constitute an actionable infringement of a trade mark and this seems to have been the early view in equity, at least in some cases. But in view of the statutory right to be protected in the use of a trade mark which has been registered in accordance with the provisions of the federal enactment it is not necessary that the complainant in order to establish infringement should show wrongful intent in fact on the part of the defendant or facts justifying its inference of such an intent. And the doctrine now seems to be settled that when a trade mark is calculated to deceive an intent to deceive will be presumed and an injunction to prevent its use will be granted, even if no one has actually been deceived."

But, if it is clear that there was no intention to deceive, it would seem that it takes a clear case that the trade-mark complained of is calculated to deceive the ordinary purchaser to justify a judgment of infringement. It is in the light of these general principles that this case is to be disposed of.

I now proceed to consider whether some of the cases cited by counsel are not substantially or fundamentally alike and hence subject to a classification which will cover the

case in hand. I have heretofore noted that plaintiff's trade-mark is a compound word. I set this aside for the time being and treat it as composed of two separate words, to wit "Coca Cola," just as the defendant's trade-mark is so composed. It would seem that generally, at least, in all such cases the first word is the more prominent of the two both to the eye and to the ear. Indeed, the prominence may be such as to dominate. In such a case similarity between the first words of the two trade-marks will be more effective in causing deception than where the similarity is between the second or last words thereof. I find in considering the cases cited that in certain of them the trade-marks of each consisted of two words. Amongst those cited by plaintiff's attorneys are only three where the trade-marks involved consisted of two words. In only one of them was the similarity between the second or last of the two words. That is the case of Paris Medicine Co. v. W. H. Hill Co. (C. C. A.) 102 F. 148, 151. The plaintiff's trade-mark was "Bromo Quinine." The defendant's trade-mark was "Bromide Quinine." It was held to be an infringement of the plaintiff's trade-mark. The second or last words were identical. The want of similarity was in the first words. But it is to be noted that as to these there was identity between the first four letters. The want of similarity between them consisted of the fact that plaintiff's word ended with "o" whereas defendant's ended with "ide." The court said:

"The general resemblance between the names 'Bromo Quinine' and 'Bromide Quinine' is very striking. The words 'Bromo Quinine' catch the eye and fasten themselves in the memory, and, as the name of the remedy, became easily known and recognizable. The difference between 'Bromo Quinine' and 'Bromide Quinine' is slight, and not likely to attract the attention of the average public."

In this connection may be considered the case of National Water Company v. O'Connell (C. C.) 159 F. 1001, cited by plaintiff's attorneys. There the two trade-marks involved each consisted of four words. That of plaintiff was "White Rock Lithia Water"; and that of defendant, "High Rock Lithia Water." The last three words of each were identical. The difference was only in the first. Whilst plaintiff was granted relief, it was not on the ground that there had been an infringement of its trade-mark, but on the ground of unfair competition. The injunction was against selling water under the name of "High Rock Lithia Water" in bottles similar to those of complainant having body and neck labels of the same coloring and style of lettering.

The other two cases referred to were N. K. Fairbank Co. v. Luckel, K. & C. Soap Co. (C. C. A.) 102 F. 327, 332; Garrett & Co. v. Sweet Valley Wine Co. (D. C.) 251 F. 371.

In each of these cases the first words of the two trade-marks involved were identical. The want of similarity was in the second word. In the first "Gold Dust" was held to be infringed by "Gold Drop," and in the second "Virginia Dare" was held to be infringed by "Virginia Belle." The first case was said to be "a close one" and infringement was based on the similarity in sound. It was said:

"In the light of the evidence, and of all the surrounding circumstances presented herein, are the names 'Gold Dust' and 'Gold Drop' so similar in sound as to deceive the unwary or mislead an unsuspecting customer to accept 'Gold Drop' for 'Gold Dust'? * * * It may be said that if one stops to reflect upon the names 'Gold Dust' and 'Gold Drop,' and listens to the sound, he will discover that the names are not entirely similar. A layman, as well as a lawyer or a judge, might so decide upon a careful inspection and reading of the names. But in determining that question we must put ourselves in the place of a purchaser of ordinary caution, who asks for a washing powder called 'Gold Dust,' and from his standpoint determine whether he would be liable to be misled or deceived by the name 'Gold Drop.'"

In the other case there were elements of unfair competition. The court noted that the word "Virginia" was the "most prominent characteristic" of plaintiff's trade-mark. It was said that many unwary purchasers "find in the word 'Virginia' alone the chief significance in complainant's label."

Note may be here taken of the case of Garrett & Co. v. Schmidt, Jr., & Bros. Wine Co. (D. C.) 256 F. 943, also cited by plaintiff's attorneys, where it was held that the same trade-mark, i. e. "Virginia Dare," was infringed by the single word "Virginette." In that case unfair competition was very prominent.

Here may be considered two decisions by the Supreme Court of the United States, cited by plaintiff's attorneys. They are the cases of Saxlehner v. Eisner, 179 U. S. 19, 21 S. Ct. 7, 45 L. Ed. 60; Hamilton Brown Shoe Co. v. Wolf Bros. & Co., 240 U. S. 251, 36 S. Ct. 269, 60 L. Ed. 629. In the first one the trade-mark "Hunjadi Janos" was held infringed by that of "Hunyadi Matyas." In

the other the trade-mark "American Girl" was held infringed by that of "American Lady." In each case there was a certain amount of unfair competition. In the "American Girl" case there was similarity of idea in the second word. In the two-word cases cited by plaintiff's attorneys we find but one of them where the similarity was in the last word, as here, and in that case the difference in the first words was very slight. The other such cases, four in number, are cases where the similarity was in the first word, the most prominent of the two and in each instance of such character as to be well-nigh dominating. There was a certain amount of unfair competition in three of them. And in the last one, though there was a difference in the last word both in appearance and sound, there was a similarity in idea.

When we come to consider cases cited by defendant's attorneys, we find five in which the trade-marks involved consisted of two words. In three of them the similarity was in the second word and the difference in the first; in two the similarity was in the first word and the difference in the second. In each case there was held to be no infringement. The three referred to are as follows: Potter D. & C. Corp. v. Pasfield Soap Co. (C. C.) 102 F. 490, 493; Sears, Roebuck & Co. v. Elliott Varnish Co. (C. C. A.) 232 F. 588, 590; Parfumerie Roger & Gallet v. M. C. M. Co. (C. C. A.) 24 F.(2d) 698, 699. In the first of these three "Cuticura Soap" was held not to be infringed by "Cuticle Soap"; in the second "Roof Leak" was held not to be infringed by "Never Leak"; and in the third "Bouquet des Amours" and "Fleurs D'Amours" were held not to be infringed by "Charme D'Amour" or "Caresse D'Amour." In the first one it will be noted that there was not only a difference as to the first word in appearance and sound, but also in idea. The court said:

"The words are to a considerable degree unlike to the eye, unlike to the ear, unlike in spelling, unlike in meaning, and unlike in suggestion."

In the second one, the court said:

"So here the appellant has appropriated only the term 'Leak,' which it, and every one else was at liberty to use and no one can claim that there is a resemblance between the words 'Roof' and 'Never.' "

In the third one the court said:

"Some buyers will be confused by the most remote similarities, and, while the owner has an equal interest in his careless customers, there is practically a limit to which in the protection of that interest he can control the use of words even of foreign origin."

In this connection may be considered the three-word trade-mark case also cited by defendant's attorneys, to wit, A. J. Krank Mfg. Co. v. Pabst (C. C. A.) 277 F. 15. It was there held that a trade-mark consisting of the words "Krank's Lather Kreem" was not infringed by the words "Twilight Lather Cream," where the labels and packages were not otherwise similar in appearance or coloring and each showed prominently the name and address of the maker and there was no evidence of purchasers having been deceived. It will be noted that, as to the first word, there was not only difference in appearance and in sound, but also in idea.

The two cases referred to in which the similarity was in the first word are these: Caron Corp. v. V. Vivaudou (C. C. A.) 4 F. (2d) 995, 997; Turner & Seymour Mfg. Co. v. A. & J. Mfg. Co. (C. C. A.) 20 F.(2d) 298, 301.

In the first it was held that a trade-mark consisting of the words "Narcisse Noir" was not infringed by the words "Narcisse Jaune." The court said:

"In all such cases we commonly use our own eyes, and must project in imagination any possible confusions to which a careless buyer might be subject. If there were proof of actual confusion, we could correct our naive impressions; but the single instance proffered is too slight."

In the second it was held that a trade-mark consisting of the words "Blue Whirl" or of the words "Blue Streak" was not infringed by the words "Blue Tip." The court said:

"Nor is the trade-mark 'Blue Whirl' or 'Blue Streak' infringed. Both consist of the words and a symbol. The only similarity is in the syllable 'Blue' in the defendants' trade-mark. But the word 'Blue,' used by both plaintiff and defendants, was common property, and commonly used by manufacturers of kitchen utensils, as pointed out. There have been other trade-marks issued where the word 'Blue' appears. The trade-marks of the plaintiff and defendants are not confusingly similar. No ordinary purchaser would take one for the other, even in combination with blue."

In this connection special note may be taken of the case of S. R. Feil Co. v. John E. Robbins Co. (C. C. A.) 220 F. 650, 652, not cited by defendant's counsel but referred to

in the case in Sears, Roebuck & Co. v. Elliott Varnish Co. (C. C. A.) 232 F. 588, cited by them. The trade-mark there was a compound word consisting of two parts, connected by a hyphen, and the trade-mark complained of consisted of two separate words. The first part of the compound word was identical with the first word of the other trade-mark and their meaning was identical also, and it was held that there was no infringement. Plaintiff's trade-mark was "Sal-vet"; that of defendant "Sal Tone." The court said:

"In the present case defendant has appropriated only the term 'Sal,' which he and every one else was at liberty to use. As between the arbitrary term 'Vet' and the word 'Tone,' there can be no reasonable resemblance. No ordinary purchaser would take the one for the other, even in combination with the word 'Sal.'"

The result then of this consideration of the cases cited involving trade-marks consisting of two words is that only a single case is to be found amongst them where the similarity was in the second word and the difference in the first, and in that case the difference was very slight. But where the similarity is in the first word and the difference is in the second, cases are to be found holding both ways as to infringement. This does not mean that the cases are in conflict. It is to be expected that in such cases infringement is more apt to exist than where the similarity is in the second word and the difference in the first. The first word coming first is the more prominent, and its prominence may be such as to dominate the trade-mark.

In the cases cited by the attorneys on both sides are cases where the trade-marks involved consisted of a single word, but made up of two syllables. It is not amiss to consider these cases, though they do not rank in significance here with the two word cases. Plaintiff's attorneys cite these cases, to wit, Moxie Nerve Food Co. v. Beach (C. C.) 33 F. 248; Stamford F. Co. v. Thatcher F. Co. (D. C.) 200 F. 324, in which the similarity was in the second syllable and the difference in the first. In the first case "Moxie" was held to be infringed by "Noxie"; in the second, "Shipmate" by "Messmate." But in the one the difference in the first syllable was very slight, and in the second the idea expressed by the first syllable was substantially the same. With these two cases may be considered these two, to wit, O'Donnell v. Riscal Mfg. Co. (D. C.) 228 F. 127; The Best Foods v. Hemphill Packing Co. (D. C.) 5 F. (2d) 355, 358, where the words consisted of three syllables. In the first one "Notamiss" was held to be infringed by "Nevermiss," and in the second "Nucoa" was held to be infringed by "Milcoa." It may be noted that in the first of these two cases, though the first syllable differed in appearance and sound, they were similar in the idea expressed. An ordinary purchaser might not recall in memory the exact appearance and sound of plaintiff's trade-mark, but might recall the idea expressed and hence might be deceived by defendant's trade-mark. Possibly the decision in the second case may be the most favorable to plaintiff of all the cases cited on its behalf. Seemingly the court held that no competitor of plaintiff could use "coa" in his trade-mark. The relief granted was against the "deceptive use by the defendant of 'coa' in its nut margarine." But it will be noted that it cited in support of the decision these cases: Celluloid Mfg. Co. v. Cellonite Mfg. Co. (C. C.) 32 F. 94; Estes v. Leslie (C. C.) 29 F. 91; Elliott Varnish Co. v. Sears, Roebuck & Co. (D. C.) 221 F. 797; Ramopa Co. v. A. Gastun & Co., Inc. (D. C.) 278 F. 557.

In the first of these four cases the word "Celluloid" was held to be infringed by "Cellonite," and in the second, "Chatter Book" by "Chatter Box." But in both these cases there was identity in the front parts of the trade-marks, and in the second of the two there was but a slight difference in the hind parts. In the third of these cases it was held that "Roof Leak" was infringed by "Never Leak." But this decision was reversed by the appellate court in the case heretofore referred to in Sears, Roebuck & Co. v. Elliott Varnish Co. (C. C. A.) 232 F. 588, where it was said that no one can claim that there is a resemblance between the words "Roof" and "Never." In the fourth there was absolute identity in the letters used. The only difference was in transposing the first and third letters.

The court was most affected by the decision in the case of Wilson & Co. v. The Best Foods Inc. (C. C. A.) 300 F. 484, where it was held that "Nucoa" was infringed by "Pecoa." The court said:

"I think 'Milcoa' is neither less nor more confusing than 'Pecoa,' but independently of the 'Pecoa' decision I think 'Milcoa' is, in legal contemplation, a colorable imitation of 'Nucoa' and, consequently, an infringement."

But that case had elements of unfair competition and was an affirmance of an order granting a preliminary injunction. The usual rule in such cases was applied.

Plaintiff's attorneys cite these cases, to wit, Hydraulic Press Brick Co. v. Stevens (D. C.) 1 F.(2d) 460; Feil v. American Serum Company (C. C. A.) 16 F.(2d) 88, where the trade-marks involved consisted of one word made up of two syllables and the similarity was in the first and the difference in the second. In the first one "Hytex" was held infringed by "Hytest," and in the second, "Wormix" by "WormX."

In this connection may be considered cases where the trade-marks involved consist of one word, but of three or more syllables. Plaintiff's attorneys cite these cases of that character, to wit: Celluloid Mfg. Co. v. Cellonite Mfg. Co. (C. C.) 32 F. 94; N. K. Fairbank Co. v. Central Lard Co. (C. C.) 64 F. 133. The first one has just been referred to. In it "Celluloid" was held to be infringed by "Cellonite." In the second "Cottolene" was held to be infringed by "Cottolean." The defendant's attorneys cite the following one word with two and three syllable trade-mark cases where the similarity was in the hind part and the difference in the front part, to wit: Valvoline Oil Co. v. Havoline Oil Co. (D. C.) 211 F. 189, 193; L. P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co. (C. C. A.) 253 F. 914. 915; Davies-Young Soap Co. v. Selig Co., 57 App. D. C. 12, 16 F.(2d) 352; Switzer v. Collins Co., 57 App. D. C. 354, 23 F. (2d) 775.

In the first case the word "Valvoline" was held not to be infringed by "Havoline." The court said:

"Here there is a real distinction in sound, in appearance, and, properly speaking, in meaning."

In the second the word "Spearmint" was held not to be infringed by "Peptomint." The court said:

" 'Peptomint' is so different in appearance and sound that there would be no infringement, even if 'Spearmint' were a proper trade-mark."

In the third case the word "Dysco" was held not to be infringed by "Selco." The court said:

"In our opinion the word 'Dysco' and 'Selco' are not so similar, either in appearance or pronunciation, as to make confusion in the trade probable."

In the fourth case it was held that the word "Buttermels" was not infringed by "Honeymels." The court said:

"The suffix 'mels' being common to both marks, the distinctive feature is between the words 'honey' and 'butter.' It was properly held by the Commissioner that no confusion could arise from the use of these two words in connection with the same quality of goods."

Defendant's attorneys cite the following cases where the similarity was in the prefix and the difference in the suffix, to wit: Ansco Photoproducts, Inc., v. Eastman Kodak Co., 57 App. D. C. 246, 19 F.(2d) 720; Everlasting Valve Co. v. Schiller (D. C.) 21 F.(2d) 641.

In the first case it was held that the word "Speedex" was not infringed by "Speedway." The court said:

"The suffixes of the competing marks, to wit, 'ex' and 'way,' if taken alone, are of course plainly dissimilar. Therefore, whatever similarity exists between the two marks must result from the use of the word 'Speed' which is the dominating term common to both. That word, however, is descriptive and of common right; and neither party can claim an exclusive right to its use, either alone or as the dominating element of a compound word."

In the second case the word "Everlasting" was held not infringed by "Evertight."

This completes our survey of the cases cited by the attorneys herein. Some general statements induced by this survey may now be made. The first one is that where the trade-marks involved consist of two words or of one word with two or more syllables, there is more apt to be infringement where there is similarity, particularly if it amounts to identity, in the front part of the trade-mark. That part comes first, is the most prominent, and it is likely to be dominating. But even in such cases there may be no infringement. In the following cases of this kind it was held that there was infringement, to wit: N. K. Fairbank Co. v. Luckel, K. & C. Soap Co. (C. C. A.) 102 F. 327; Garrett & Co. v. Sweet Valley Wine Co. (D. C.) 251 F. 371; Saxlehner v. Eisner, 179 U. S. 19, 21 S. Ct. 7, 45 L. Ed. 60; Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U. S. 251, 36 S. Ct. 269, 60 L. Ed. 629; Hydraulic Press Brick Co. v. Stevens (D. C.) 1 F.(2d) 460; Feil v. American Serum Co. (C. C. A.) 16 F.(2d) 88; Celluloid Mfg. Co. v. Cellonite Co. (C. C.) 32 F. 94; N. K. Fairbank Co. v. Central Lard Co. (C. C.) 64 F. 133.

In the following cases of that kind it was held that there was no infringement: Caron Corp. v. Vivaudou (C. C. A.) 4 F.(2d) 995; Turner & Seymour Mfg. Co. v. A. & J. Mfg. Co. (C. C. A.) 20 F.(2d) 298; S. R. Feil Co. v. John E. Robbins Co. (C. C. A.) 220 F.

650; Ansco Photo Co. v. Eastman Kodak Co., 57 App. D. C. 246, 19 F.(2d) 720; Everlasting Valve Co. v. Schiller (D. C.) 21 F. (2d) 641.

As to the cases where the similarity was in the back part it was held that there was infringement in the following cases: Paris Medicine Co. v. W. H. Hill Co. (C. C. A.) 102 F. 148; Stamford Foundry Co. v. Thatcher Furnace Co. (D. C.) 200 F. 324; O'Donnell v. Riscal Mfg. Co. (D. C.) 228 F. 127; The Best Foods v. Hemphill Packing Co. (D. C.) 5 F.(2d) 355.

In the first two of these cases the similarity of the front parts amounted almost to identity. In the third one there was similarity of meaning in the front parts. The fourth one is the "Nucoa" case, which I have criticized somewhat.

In the following cases of this kind it was held that there was no infringement, to wit: Potter D. & C. Corp. v. Pasfield Soap Co. (C. C.) 102 F. 490; Sears, Roebuck & Co. v. Elliott Varnish Co. (C. C. A.) 232 F. 588; Parfumerie Roger & Gallet v. M. C. M. Co. (C. C. A.) 24 F.(2d) 698; A. J. Krank Mfg. Co. v. Pabst (C. C. A.) 277 F. 15; Valvoline Oil Co. v. Havoline Oil Co. (D. C.) 211 F. 189; L. P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co. (C. C. A.) 253 F. 914; Richmond Remedies Co. v. Dr. Miles Medical Co., 16 F.(2d) 598; Switzer v. Collins Co., 57 App. D. C. 354, 23 F.(2d) 775.

I think, therefore, that I am justified in drawing from this survey the general rule that in such cases where the front part of the two trade-marks involved differ in appearance, sound, and meaning, there is no infringement even though there may be similarity amounting to identity in the last parts. It is only a very exceptional case which will not be governed by this rule. Possibly deeper reflection on these cases and a wider survey might affect this statement, but I shall accept it as sound in disposing of this case. What do we find here? There is identity between the second word of defendant's trade-mark and the second part of plaintiff's compound word, but there is no substantial similarity between the first word of the former and the first part of the latter, either in appearance, sound, or meaning. The first part of plaintiff's compound word has some meaning. It at least suggests that plaintiff's article has some connection with the coca leaf as well as the cola nut. The first word of defendant's trade-mark has no meaning. It is purely arbitrary. In determining the question as to the similarity in appearance and sound, note

should be taken of how well known plaintiff's article is. Its trade-mark has been burnt into the consciousness of people generally. Instinctively one recalls in memory its appearance and sound. It would seem to be well-nigh incredible that one calling for "Coca-Cola" and furnished a bottle of defendant's article would think that he was receiving plaintiff's and would not at once recognize that he was not.

But I am not yet out of the woods. I trust that up until now I have not been unable to see the wood for the trees.

The decisions relied on by plaintiff where its trade-mark has been held to have been infringed have to be reckoned with. They are the decisions in the following cases, to wit: Coca-Cola Co. v. Duberstein (D. C.) 249 F. 763, 765; Coca-Cola Co. v. Old Dominion Beverage Co. (C. C. A.) 271 F. 600, 602; Coca-Cola Co. v. Chero-Cola Co., 51 App. D. C. 27, 273 F. 755, 756.

What is relied on in the first case is the statement in the opinion near its close that,

"'El-Cola' is in itself an infringement of complainant's trade-mark 'Coca-Cola.'"

The necessities of that case called for no expression of opinion on this subject. It was a clear case of infringement of trade-mark and of unfair competition. The defendant had been infringing plaintiff's trade-mark by using the words "Coca & Cola," purchasing his product from John B. Fletcher of Nashville, who had been enjoined from selling it as "Fletcher's Coca-cola" in Nashville Syrup Co. v. Coca-Cola Co. (C. C. A.) 215 F. 527, Ann. Cas. 1915B, 358. Pending the litigation, he pasted labels on the bottles in which he had sold his product over the words "Cola & Cola" blown into them and then sold the article. He was held to have been guilty of contempt of court in so doing.

The second case also involved a clear-cut case of unfair competition. It was held, however, that there was an infringement of plaintiff's trade-mark by the use of the compound word "Taka-Kola" in marking defendant's product. The word itself was like plaintiff's, in that it was a compound word; its two parts being connected by a hyphen. It was further like plaintiff's in that it was displayed in script. In the opinion the two trade-marks are analyzed into their ultimate elements and as thus analyzed compared. Such a process, it seems to me, is apt to be misleading, because the ordinary purchaser does not analyze such words into their ultimate elements. He takes in the trade-mark

as a whole and not otherwise. The court said:

"In the instant case the defendant's mark 'Taka-Kola' consists, as does 'Coca-Cola,' of two words, each of four letters and of two syllables. In each phrase a consonant and a vowel alternate, there being in each four of the one and four of the other. In plaintiffs' a and o each appear twice. Defendant's has three a's and one o. The consonant l is common to both, and each is the seventh letter from the beginning. Plaintiff's contains three c's, having in every instance the hard or k sound. Twice defendant replaces the c with a k, and once by a t, the use of which last must be relied upon to distinguish the two words, for in every other respect they are for all practical purposes identical."

Notwithstanding this, it does not seem to me that "Taka-Kola" looks like "Coca-Cola," nor does it sound like it. In none of the cases considered do I find any such deep analysis of the competing trade-marks. I have analyzed somewhat the trade-marks involved in the cases cited and referred to, but it was solely with the view of locating in them the points of resemblance and difference as they appear to the ordinary purchaser; that is, in the front or rear. I might have limited the analysis to pointing out that they were in the front or rear as the case was. An ordinary purchaser takes in these features. But he makes no such deep analysis as was made in this case. I have, however, no disposition to question the correctness of the decision. If a retailer were to say to a possible customer "Will you have Cola?" in view of the prominence of plaintiff's article which is such as to justify thinking of it as the Cola drink, such purchaser might reasonably think that the retailer had in mind such article. The question might be put, "Will you take a Cola?" with the same result. Such a trade-mark may be said to have a tendency to bring about confusion in this way, particularly if there is any similarity in dress. But it is to be noted that the nickname in use for the plaintiff's article comes from the first part of its trade-mark. It is "Koke" which was held to be an infringement of plaintiff's trade-mark by the Supreme Court of the United States in the case heretofore cited. This evidences that it is the first part of plaintiff's trade-mark which dominates. The first word of defendant's trade-mark yields no such nickname.

In the third case it was held that plaintiff's trade-mark was infringed by the compound word "Chero Cola." The question of infringement was not unaffected by other considerations than a comparison of the two words, i. e. the consideration was not limited to such comparison. The court said:

"Many witnesses testified to numerous instances of actual confusion produced by applicant's mark. Even counsel for applicant, in the cross-examination of witnesses, several times confused 'Coca-Cola' with 'Chero-Cola.' The statute does not require proof of actual confusion, but when there is such proof it is not easy to escape the conclusion that the assailed mark, if registered, would be likely to do that which it has done."

In the course of the opinion, the court said:

"Ordinarily the prospective purchaser does not carry more than a faint impression of the mark he is looking for. If the article offered to him bears a mark having any resemblance to the one he is thinking of, he is likely to accept it. He acts quickly. He is governed by a general glance. The law does not require more of him."

As I view it a prospective purchaser of plaintiff's article carries more than a faint impression of its mark. Indeed, I would think that he carries a distinct and vivid impression of how it looks and how it sounds. In the Duberstein Case, supra, the court, as to plaintiff's mark, said:

"By the expenditure of millions of dollars in advertising it has become well known throughout the land. The name means, and is understood by the public to mean, complainant's product."

This being so, it is not to be expected that the public will easily or readily be fooled in taking another article for it.

In the plaintiff's letter of March 31, 1923, to defendant, reference is made to numerous other names having been held to be an infringement of plaintiff's trade-mark. My attention has not otherwise been called to such holdings. In the absence of further information in regard thereto, I take no further notice thereof. What this case comes to, then, if defendant's trade-mark is an infringement of plaintiff's, is that it is entitled to a monopoly of the word "Cola." No trade-mark containing that word can stand, no matter how well it distinguishes the particular "Cola" had in view. It would be an infringement for one to mark his goods "Another Cola" or "A Different Cola" or "A Better Cola." For, as I view it, defendant's mark, "Roxa Kola," is the same as if it were either of the first two of these suggested. But the action of the appellate court of this circuit

in the case of Coca-Cola Co. v. Gay-Ola Co. (C. C. A.) 211 F. 942, 945, in prescribing the form of decree to be entered by the lower court, is against such an extreme position. Concerning the bottle the provision was:

"The bottling package so authorized is a long-necked clear-glass bottle having two complete annular ribs and two partially complete such ribs blown in the body of the bottle; and having the word 'Gay-Ola' in large capital letters blown in the shoulder thereof, and the words 'The Improved Cola' in the body thereof; being also provided with a cap or crown on which the words 'Gay-Ola, It's Better,' are printed in red."

In the opinion of the court the words "The Improved Cola" was not an infringement of plaintiff's trade-mark.

It is now in order to present what took place in July, 1925, heretofore referred to and pretermitted for later presentation. The plaintiff then sent to Carlisle two of its agents to ascertain and find out how defendant's product was being handled. They testified that they were there on the four days of July 16, 17, 18, and 21 and made calls upon nineteen retailers. Of these five did not handle soft drinks; three handled Coca-Cola; and eleven handled Roxa Kola only. Of these eleven there were four who, when Coca-Cola was called for, said they did not have it and offered Roxa Kola and orange or lemon, and seven who served Roxa Kola on such calls. They made thirty-five calls on these: Five on the 16th, Thursday; six on the 17th, Friday; fifteen on the 18th, Saturday; and nine on the 21st, Tuesday. These calls were distributed as follows: Six on each of four of them; five on one; four on one; and two on one. They testified positively that on each occasion they called for Coca-Cola and Roxa Kola was furnished them without anything being said. They further testified that they visited defendant's plant on each of the three days, the 16th, 17th, and 18th, and upon their call for Coca-Cola were furnished Roxa Kola. They did not on either occasion make a verbal call. They said nothing verbally on the subject. In each instance they submitted a written order for Coca-Cola. On the first day the order was for "six bottles of grape, 12 bottles of Coca-Cola and six bottles of orange." The twenty-four bottles made a case. On the second day it was for "2 cases, 12 bottles of grape, 6 bottles of peach, a case of Coca-Cola and 6 bottles of orange." On the last day it was for "a case of Coca-Cola." On the first occasion plaintiff's agents made a deposit of $1 to secure the return of the empty bottles. They were returned on the second occasion and the deposit taken up. On that occasion a deposit of 50 cents was made to secure the return of the empty bottles which was taken up on the return thereof. Two employees of defendant were present on the first two occasions, one of whom handled the transaction. Seemingly a different employee handled the third transaction.

Each of the seven retailers in his testimony contradicted the testimony of plaintiff's witnesses, i. e. they denied that they had ever sold Roxa Kola for Coca-Cola. The employee of defendant who handled the first two transactions contradicted their testimony. He testified that no order was given on either occasion; that on the first occasion the agents called for Coca-Cola and he told them that they did not make or handle it, but made Roxa Kola and they thereupon called for it; that on the second occasion they called for the two cases not mentioning Coca-Cola and that it was under these circumstances and none other that Roxa Kola was supplied to plaintiff's agents. The employee who handled the third transaction was not introduced and no explanation given of his nonintroduction. Possibly it was not known who he was.

Which of these differing witnesses is to be believed is a difficult matter to determine. There was nothing in the bearing of any of them on the stand or in their testimony affecting their credibility. Possibly plaintiff has failed to make a case here because of having the burden of proof. But possibly there are circumstances which give greater weight to plaintiff's two witnesses sufficient to sustain this burden. It is hardly likely that a successful concern like plaintiff or its agents in an effort to suppress the small business done by the defendant, a $3,000 corporation, would deliberately make a case against it. Then, if its retailers and employees had actually been guilty of wrongdoing, it should be taken into consideration that it requires an effort on the part of a wrongdoer to own to his wrongdoing. To do so he must erect himself above himself. The plaintiff looks upon the testimony of what took place at defendant's plant to be irreconcilable. It does not question the truthfulness of the testimony of the retailers. It says that their testimony and that of their agents can be harmonized. Possibly it serves its purpose best to take this position. It suggests that the retailers thought the call for Coca-Cola was a call for Roxa Kola. This would only be on the basis that they did not know the difference between Coca-Cola and Roxa Kola. In this way it

gets what its case otherwise lacks, to wit, confusion between the two trade-marks. But it is impossible to accept this suggestion. There is not the slightest reason for accepting it. The retailers beyond question did know the difference between the two names, and would at once recognize that when Coca-Cola was called for, it was Coca-Cola and not Roxa Kola. So that it must be recognized that here, as in the case of what took place at the plant, there was conflict or the testimony must be reconciled in some other way. There is another way, which is, at least, quite plausible. The recollection of the retailers as to what took place some time previously was calculated to be somewhat dim. It may have been, as testified to by plaintiff's agents, that when they called for Coca-Cola they were supplied with Roxa Kola without anything being said, and yet the retailers may not have been conscious of the fact that they were passing off the latter for the former. It must be taken that in Carlisle, a small town of 2,500 inhabitants, everybody knew the difference between Coca-Cola and Roxa Kola and that they were not the same. The defendant had carried on its business for over twelve years, and its truck or trucks were constantly on its streets with its sign prominently displayed. At the same time Coca-Cola was handled in Carlisle by retailers to a greater or less extent, and the trucks of the Lexington Bottling Works operated by Mitchell with the Coca-Cola sign on them were constantly there also. It is not unlikely that there was local interest and pride in defendant, and the community was largely on the side of defendant in the keen competition between it and its overpowering competitor. The plaintiff's agents testified that they found in the town three retailers who handled plaintiff's product exclusively and eleven who thus handled defendant's product. It may be that when the retailers in question handed out Roxa Kola, when Coca-Cola was called for, they were not consciously passing the former off for the latter. They so did on the idea that the would-be purchaser would, when the bottle of Roxa Kola was handed him, at once recognize that it was not Coca-Cola and if he was not willing to take it in place of that article at once hand it back. In this way the retailer would get him to accept Roxa Kola in place of Coca-Cola without stating to him that he did not handle it and trying to persuade him to be satisfied with it. Four of the retailers handling defendant's product did pursue this course. That they did so evidence that in so far as passing defendant's goods off for

plaintiff's was going on in Carlisle it was not at its instance or these four retailers were more honest than the others. This view of the matter is supported somewhat by the testimony as to what took place in Campbell's Grocery, one of the seven retailers referred to. They applied to a young girl clerk for Coca-Cola, and she in their plain hearing inquired of her mother whether they had any Roxa Kola in the ice box, and upon being told that they had she went to the ice box on which one of defendant's signs was displayed, and getting one of the Roxa Kola bottles handed it to them without giving a word of explanation.

On the same basis the testimony of what took place at defendant's bottling plant may be reconciled to a certain extent at least. On the first occasion the defendant's employee gave the plaintiff's agent a receipt for the deposit and on one of its billheads, on which the drinks handled by it were printed, that of Roxa Kola being the first one and in much larger letters, the blank opposite which was filled in with the quantity of Roxa Kola called for. Besides, the requirement of the return of the empty bottles and of a deposit to secure their return tends to rebut the idea that any deception was consciously being practiced, and the conduct of defendant's employees is to be accounted for on the basis suggested.

Of course, if defendant's retailers and employees were attempting to deceive would-be purchasers as plaintiff's testimony tends to cause one to think, it is calculated to prejudice one against defendant, but such prejudice should not blind one to the fact that, even if such deception was attempted, it has not the slightest bearing on the question involved in this case, and that is whether defendant's trade-mark is calculated to deceive would-be purchasers of plaintiff's article, that defendant's article was its article. The plaintiff's agents were not ordinary purchasers and they were not in fact deceived.

This leads me to emphasize here the entire absence of any evidence that an ordinary purchaser was ever deceived. Such evidence in a clear case of infringement is not essential, and its absence may be of no consequence; but in a doubtful case, which is the most favorable view which can be taken of plaintiff's case here, it is of decided significance. As first pointed out, plaintiff has attempted to supply this lack by the suggestion that the retailers thought Roxa Kola was called for when its agents asked for Coca-Cola, a suggestion that cannot possibly be

accepted. It relies also on the fact that defendant's employees who handled the two transactions at its plant on July 16th and 17th, in referring to what he said to plaintiff's agent, testified that he said, "I told him we did not make Roxa Kola, Coca-Cola only." It urges that this answer shows that he confused the two articles. It could only have been so if he did not know the difference between the two, which is absurd. The mistake is to be accounted for by the fact that it was a mere slip of the tongue. It is possible for one when referring to one of two objects to mention the other without any thought that they are the same or any confusion between them. In the Chero-Cola case the court took note of the fact that counsel for the applicant several times in the cross-examination of witnesses confused "Coca-Cola" with "Chero-Cola," i. e. I suppose used the one when he intended to use the other, which no doubt is the source of the suggestion here. I would expect that the mistake there, as here, was a mere slip of the tongue.

This absence of evidence that an ordinary purchaser was ever deceived or of any confusion of the two trade-marks is supplemented by other strong evidence that defendant's trade-mark was not calculated to deceive such purchaser and hence is not an infringement. Both Mitchell and Rainwater, two of plaintiff's distributors, vitally interested in its trade-mark and infringements thereof, for years before this litigation arose knew of the Wainscott trade-mark used by defendant and never made complaint of it. Mitchell went so far as to allow his picture to be taken in Wainscott's booth, thus evidencing a friendly attitude toward him and his trade-mark. This cannot be accounted for except on the ground that neither thought such trade-mark to be calculated to deceive and an infringement. In addition, there is the acquiescence, if not consent, of plaintiff's attorneys to the continued use by defendant of its trade-mark on the basis that there be no substitution. This, too, can only be accounted for on the ground just stated or that they thought that plaintiff for some other reason could not stop defendant from using its trade-mark.

In this connection it may be noted that there is room, at least, to infer that on the occasion of the visit of plaintiff's agents to Carlisle in July, 1925, an investigation was made by its agents of the method of handling Roxa Kola throughout the entire territory covered by Wainscott and his subsidiaries, and what was discovered at Carlisle were the only instances of supplying Roxa Kola when Coca-Cola was called for that they were able to find. It must be accepted that plaintiff was fully advised before the Carlisle investigation of the extent of the Roxa Kola business. There is an entire absence of any evidence as to when plaintiff first discovered the existence of Roxa Kola or as to any investigations made by it except on February 2, 1923, and July, 1925. Its distributors, Mitchell and Rainwater, seem to have known all about it almost from the first. There is room to think that plaintiff relied on its distributors to a certain extent, at least, to keep it advised of competing goods. But whether or not it knew anything about Roxa Kola before April, 1922, its attorneys who handled its legal business did at that time see one of Wainscott's advertisements in a magazine. It is not without significance that plaintiff's agents when investigating defendant in July, 1925, made their headquarters at Winchester, where Wainscott's plant at which Roxa Kola is produced was located. They went to Carlisle each morning by automobile and returned to Winchester each night. Why did they put up at Winchester rather than Lexington? That they limited their investigations to defendant is hard to conceive. What were they doing on Monday, the 20th? Were they doing anything or investigating and, if so, where? One cannot, therefore, help inferring that on this occasion a full investigation was made of how Roxa Kola was being handled throughout its territory, and the only instances where it was discovered that Roxa Kola was being furnished when Coca-Cola was called for were those testified to by plaintiff's agents in this case. How otherwise is plaintiff's taking no action against Wainscott and other subsidiaries to be accounted for? This suggests that plaintiff's plan of campaign is to proceed against the defendant, whose case is more or less prejudiced by these possible instances of wrongdoing, and after obtaining a decision herein that its trade-mark is infringed, then proceeding against Wainscott and his other subsidiaries.

It is urged by defendant that plaintiff's right to relief is affected by laches. This question is much discussed by counsel and the relevant decisions are cited. I refrain from going into this question, not because I do not think plaintiff's right is not so affected. I am inclined to think that it is. But the necessities of this case do not require that I take position on this question. To do so calls for further labor on my part and an extension of this extremely long opinion, and my patience with the case has given out. I would only refer to some matters which have

a bearing on this question as to which I have conviction. One is that it is not to be taken that plaintiff had no knowledge of Roxa Kola before April, 1922. One of plaintiff's attorneys testified that he first heard of it at that time. That such was the case does not negative that plaintiff's officers may have known of it for years before. The plaintiff has not seen fit to enlighten the court as to when it first became aware of its existence or the extent of its investigations in regard thereto. The circumstances are such that I cannot help believe that plaintiff knew of it long before April, 1922. Another is that I do not think that Wainscott or defendant have consciously infringed plaintiff's rights. There can be no question that Wainscott was led to put out Roxa Kola by plaintiff's success. But his aim was to take advantage of the demand created for that sort of goods by introducing a competing article—not by acquiring a part of plaintiff's trade through passing his goods off for its. A still further matter to be referred to in this connection is that the cases which hold that plaintiff's right is unaffected by laches were cases presenting a clear case of infringement. It cannot be claimed for plaintiff more than that it makes out a case of doubtful infringement.

I have not considered the question as to whether plaintiff is entitled to an injunction against further substitution. This is because I do not understand that plaintiff desires such relief. It has never asked for it in argument. It is not likely that there will be further trouble along this line. As I understand it, all plaintiff seeks is an injunction against further use by defendant of the trade-mark "Roxa Kola."

I therefore hold that plaintiff's bill be dismissed, at its costs.