## N. K. FAIRBANK CO. v. R. W. BELL MANUF'G CO.

### (Circuit Court of Appeals, Second Circuit. December 8, 1896.)

**1. UNFAIR COMPETITION IN TRADE—SIMULATION OF PACKAGES.**

In applying the test recognized by the authorities, namely, the likelihood of deception of an "ordinary purchaser exercising ordinary care," regard must be had to the class of persons who purchase the particular article for consumption, and to the circumstances ordinarily attending their purchase.

**2. SAME—DECEPTION OF CONSUMER.**

In determining whether packages are so dressed up as to be calculated to deceive purchasers, equity regards the consumer as well as the middleman, for it is to him, more than to the jobber or wholesale purchaser, that the various indicia of origin appeal; and the courts will not tolerate a deception devised to delude the consuming purchaser by simulating some well-known and · popular style of package.

**3. SAME—INTENT TO SIMULATE.**

Even though the court is satisfied that a new form of package was devised by defendant, with an intent to simulate complainant's package, the continued use of such package will not be enjoined unless the similarity is of a character to convey a false impression to the public mind, and to mislead and deceive the ordinary purchaser.

**4. SAME—INFERENCE FROM CHANGES PRODUCING SIMILITUDE.**

Complainant, having begun to manufacture soap powder having a new ingredient giving it a yellow color, devised a new, distinctive, and attractive package of a yellow color, bearing the words "Gold Dust" and "Washing Powder," together with the maker's name, and with numerous indicia and directions upon the various panels. After complainant had sold soap powders in this form for two or three years, and expended large sums in advertising it, defendant company, which had been selling washing powders in small, red packages, also began manufacturing a yellow washing powder, which it styled "Buffalo Powder." This powder it put up in packages of the same size as complainant's, using a yellow wrapper of the same shade, and making numerous changes in its indicia, all of which constituted an approach to those used by complainant, though avoiding exact similarity. *Held* that, notwithstanding the fact that the word "Buffalo," together with defendant's name, on the packages, was distinctive, the changes were manifestly made with an intent to simulate complainant's packages, and to enable retail dealers to pass them off for complainant's; and, it appearing that this, in fact, was often done, that an injunction should issue. 71 Fed. 295, reversed.

**5. SAME—FORM OF INJUNCTION.**

Where defendant's packages resembled complainant's in numerous particulars besides those of size, color, and form, *held*, that an injunction should be granted restraining the sale of that particular form of package, or any other form which should, by reason of the collocation of size, shape, color, lettering, spacing, and ornamentation, present a general appearance as closely resembling complainant's packages as the one complained of; but that a clause should be added to the effect that the injunction should not be construed as preventing the sale of packages of the size, weight, shape, or color of complainant's package, provided that they were so differentiated in general appearance as not to be calculated to deceive the ordinary purchaser.

Appeal from the Circuit Court of the United States for the Northern District of New York.

This is an appeal from a final decree of the circuit court of the Northern district of New York dismissing the bill of complaint. The suit was brought by the complainant, an Illinois corporation, against the defendant, a New York corporation, to restrain unfair competition in business. The subject of complaint is the use by defendant in its business of what is alleged to be a fraudulent form of package.

Rowland Cox, for appellant.

Tracy C. Becker, for appellee.

Before LACOMBE and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge.　As is quite common in cases of this kind, the questions presented in the record are almost wholly questions of fact.　The law governing the subject of unfair competition is abundantly settled by authority.　It may be epitomized in the following citations:

In Nail Co. v. Bennett, 43 Fed. 800, it was alleged that defendants had imitated plaintiff's method of bronzing horseshoe nails, with the intention of deceiving the public into buying their goods instead of the plaintiff's.　The case coming up on demurrer, Mr. Justice Bradley said:

"Whether this [the bronzing of the nails] is a good trade-mark or not, it is a style of goods adopted by the complainant, which the defendants have imitated for the purpose of deceiving, and have deceived the public thereby, and induced them to buy their goods as the goods of the complainant. This is fraud; * * * a substantial charge, which the defendant should be required to answer."

This decision is cited with approval in Lawrence Manuf'g Co. v. Tennessee Manuf'g Co., 138 U. S. 549, 11 Sup. Ct. 396, where the supreme court recognizes the existence of cases, not strictly of trade-marks, but "analogous to trade-marks; that is to say, on the ground of fraud on the public and on the plaintiff, perpetrated by defendant by intentionally and fraudulently selling its goods as those of the plaintiff. Undoubtedly an unfair and fraudulent competition against the business of the plaintiff, conducted with the intent, on the part of the defendant, to palm off its goods as plaintiff's, would, in a proper case, constitute ground for relief."

And in a more recent case the same court says:

"There can be no question of the soundness of the * * * proposition that, irrespective of the technical question of trade-mark, the defendants have no right to dress their goods up in such manner as to deceive an intending purchaser, and induce him to believe he is buying those of the plaintiffs. Rival manufacturers may lawfully compete for the patronage of the public in the quality and price of their goods, in the beauty and tastefulness of their inclosing packages, in the extent of their advertising, and in the employment of agents; but they have no right, by imitative devices, to beguile the public into buying their wares under the impression they are buying those of their rivals." Coats v. Thread Co., 149 U. S. 566, 13 Sup. Ct. 966.

Inasmuch as the issue raised in such cases is one of fraud,—of deceitful representation, or perfidious dealing,—it is evident that the intent of the defendant, when that is clearly made out, is often illuminative of the question to be decided. Scheuer v. Muller, 20 C. C. A. 161, 74 Fed. 225.　And such intent may be, and often is, made out, not from direct testimony, but as a clear inference from all the circumstances, even where defendant protests that his intention was innocent.　What degree of similarity must exist to warrant the intervention of a court cannot, in the nature of things, be specifically defined in advance.　The general rule is best stated by the supreme court in the following excerpt:

"Much must depend in every case upon the appearance and special characteristics of the entire device; but it is safe to declare, as a general rule, that exact

similitude is not required to constitute an infringement, or to entitle the complain-ing party to protection. If the form, marks, contents, words, or the special arrangement of the same, or the general appearance of the alleged infringer's device, is such as would be likely to mislead one in the ordinary course of pur-chasing the goods, and induce him to suppose he was purchasing the genuine article, then the similitude is such as entitles the injured party to equitable protection. * * * Difficulty frequently arises in determining the question of infringement; but it is clear that exact similiarity is not required, as that requirement would always enable the wrongdoer to evade responsibility for his wrongful acts. Colorable imitation, which requires careful inspection to dis-tinguish the spurious trade-mark from the genuine, is sufficient to maintain the issue; but a court of equity will not interfere when ordinary attention by the purchaser of the article would enable him at once to discriminate the one from the other. Where the similarity is sufficient to convey a false impression to the public mind, and is of a character to mislead and deceive the ordinary pur-chaser, in the exercise of ordinary care and caution in such matters, it is sufficient to give the injured party a right to redress."

Precisely what was the similarity in the case quoted from it is not easy to make out. Written descriptions of labels and wrappings are nearly always most unsatisfactory. Certainly it was not the use of the name either of the maker or of the pills, for continued use of such names was enjoined only when used with particular varieties of label or wrapper. Apparently it was the color of the letters used, white on a black background, and the shading of the background by diagonal lines crossing each other, which produced the resemblance. Of these labels or wrappers the court says:

"Witnesses in great numbers were called by the complainant, who testified that Exhibits L and K of the respondent were calculated to deceive purchasers, and the reasons given by them in support of the conclusion are both persuasive and convincing. Differences between those exhibits and Exhibits F and H of the complainant undoubtedly exist; and still it is manifest that the general appearance of the package in the respects mentioned, and others which might be suggested, is well calculated to mislead and deceive the unwary and all others who purchase the article without opening the box and examining the label." McLean v. Fleming, 96 U. S. 254, 256.

Necessarily, in applying the test suggested, viz. the likelihood of deception of an "ordinary purchaser exercising oridnary care," re-gard must be had to the class of persons who purchase the particular article for consumption, and to the circumstances ordinarily attend-ing their purchase.

The facts disclosed by the records in this case are as follows:

The article in question is a soap powder. Such powders have been on the market for many years. Prior to 1887 they were uniformly white in color. They were compounded of animal fats, or cotton-seed oil and soda ash. In the manufacture of cotton-seed oil there is a re-siduum, known as "foots," and in the spring of 1887 complainant tried it as a constituent of soap powder, with satisfactory results. The powder thus produced was yellow,—a circumstance which suggested the name "Gold Dust," under which it was put upon the market. Being about to introduce it to the public, complainant set to work to devise an attractive and distinctive form of package. All soap pow-ders at that time were sold in comparatively small packages, generally rectangular, and holding six ounces, eight ounces, or one pound. It is impossible, within the limits of this opinion, or, indeed, by any writ-ten description, to set forth the condition of the business as it existed

in 1887, and as it has been proved without contradiction, by exhibits
of every form of soap-powder package at that time on the market.
Suffice it to say that plaintiff's new form of package for its "Gold
Dust" was a radical and unmistakable departure from every variety of
soap-powder package then existing.  By no possible chance could any
one mistake complainant's package for that of any of its competitors.
It is a large package, holding four pounds, rectangular, six-sided, and
covered with paper of a dark yellow color.  A little above the center
of the principal panel there is a vignette, representing two naked
negro children standing behind a heap of gold coin; upon a white
scroll, which arches over the vignette, there is, in black letters, the
word "Fairbank's"; below the vignette are the words "Gold Dust";
at the bottom of the panel the words "Washing Powder," white on a
black ground.  There is no border to this panel, but in the upper cor-
ners are two circular spaces, inscribed, respectively, with the mark,
"4 lbs.," and with an heraldic device, black on yellow.  The rear panel
contains a statement, in black letters on the yellow ground, extolling
the excellencies of the powder.  On the two side panels, in like man-
ner, are printed statements of the purposes for which the powder may
be used, and directions for using it.  The lettering runs across these
side panels, and justifies with the lines on the back and front panels.
On the top and bottom panels are further commendations and a warn-
ing to beware of imitations, all in black letters on the yellow ground.
All the panels except the front one are surrounded with a border con-
sisting of a light blue strip included within heavy black lines.  The
width of the border is a little under one-quarter inch.

  Having devised this distinctive package, complainant offered its
goods for sale, under the name of "Gold Dust" washing powder, and
has continued the use of that style of package continuously until now.
It has made great exertions to extend the sale of its product, has ex-
pended upward of $300,000 in advertising it, and has thereby created
a large demand in every state and territory of the United States, hav-
ing sold upward of 100,000 packages within the 12 months ending
June, 1894.  Purchasers for consumption usually ask for "Gold
Dust," sometimes adding the words "washing powder," and some-
times, but more rarely, "Fairbank's."  Shortly after the introduction
of complainant's four-pound package, James S. Kirk & Co. also put
upon the market a four-pound package of "Kirkoline" washing pow-
der, rectangular, and covered with dark yellow paper.  Inspection of
this package is sufficient to show that, although, in size, form, and
color, it is like complainant's, they differ so widely in general appear-
ance that one cannot be mistaken for the other.  Other exhibits of
subsequent packages, rectangular in form and of the four-pound size,
show plainly how easy it is to devise a distinctive style of wrapping
which will present no resemblance whatever to plaintiff's package.
When it is remembered that, besides size, color, and shape, there is an
almost endless variety of border, scroll work, lettering, and decora-
tion available for the production of what, in the completed package,
makes up the general appearance, it is manifest that no one need
pack his goods into cartons resembling his competitor's, unless he
chooses so to do.

As far back as 1884 defendant was making a white soap powder, which it put upon the market as "Soapona," in one pound and in six and eight ounce packages. The front, top, and bottom panels were lettered in yellow on a red ground; the other panels, lettered in red on a yellow ground. About 1890 the size of these packages was increased to four pounds, so that, in size and shape, they were exactly like plaintiff's, but by reason of coloring, lettering, and ornamentation, or, rather, its absence, they differed so widely therefrom that any confusion of the two was impossible. The four-pound packages preserved the red background on the principal panel and on the top and bottom. All lettering on this ground was yellow. On the top was a large figure "4," and the words, "The Big 4. Trade-Mark." On the bottom there was a statement of the uses of the soap powder, and on the front the words, "Bell's 4 lb. Soapona for All Household Purposes. Washing and Cleaning without Injury to Hands or Fabric. R. W. Bell & Co., Buffalo, N. Y." The rear panel was yellow, containing nothing, except in the center, where a large "C," in script, inclosed a statement that a coupon would be found inside the box. The two long panels contained directions for use, in red letters on a yellow ground, the lines of type running lengthwise with the panel. The back and side panels were surrounded by a red border, about a half inch in width.

In 1892 or 1893 defendant began to use "foots" in the manufacture of soap powder, thus producing a yellow powder, and thereupon set to work to select a new name, and devise a new form of package, with the following result: Defendant's package is rectangular, and, of course, of the same size as other four-pound packages. The paper covering it is dark yellow, of about the same shade as complainant's. A little above the center of the front panel is a vignette of a sow washing a pig. The vignette is arched over with a white scroll; but, whereas, the scroll in complainant's package is a segment of a circle, in defendant's it is apparently a segment of an ellipse, and its ends are turned outward towards the edges of the package. On the white scroll, in black letters, is the word "Buffalo," and below the vignette the words, "Soap Powder," in white, partly on a yellow, but mainly on a black, ground. On the bottom are the words, "R. W. Bell Co., Buffalo, N. Y." There is no border to this panel. In its upper corners are two circular spaces,—the one containing the mark, "4 pounds," white on black; the other, a buffalo's head, black on white. The rear panel is filled up with commendations of the contents, black letters on yellow ground. The same is true of the top and bottom. On the two side panels are directions for use, such as appeared on the original Soapona package, but they are printed in black on yellow, and the lines no longer run lengthwise, but across the panel, justifying with the lines on the front and rear panels. Around every panel, except the front one, there is a border, from an eighth to a quarter inch in width, consisting of a very pale blue center bordered by two heavy black lines. Possibly the center of the border is white, but, if so, the heavy black lines, by an optical illusion, give it the appearance of pale blue. The corners of the border in complainant's package are rounded; in defendant's, they are right-angled.

Since this new style of package was devised, defendant has con-

tinued the sale of its yellow soap powder, made from "foots," in both the old and the new style of package, selling, however, but few of the red "Soapona" packages, and pushing the sale of the new yellow and black "Buffalo" packages, which has largely increased. It is a sharp competitor of complainant, offers its soap powder to the trade within the same territory at a price 25 per cent. below the wholesale price of complainant, and in some parts of the country, where the sales of "Buffalo" powder have been successfully pushed, the sales of complainant's powder have decreased. All the facts heretofore set forth stand wholly undisputed upon the record.

The defendant explains its adoption of a new form of package, differing from the original "Soapona," as follows: The name "Soapona" was found to resemble that of a prior washing preparation, made by some one else, and called "Soapine," so closely as to produce confusion. The red color is also affected by the alkali in the preparation, resulting in discoloration and spotting of the packages. The colors least susceptible to such action are yellow, brown, manilla, white, and gray; but white and gray are likely to soil in handling. The officers of defendant testify that, in making these changes, they had no intention to deceive customers by inducing them to purchase the "Buffalo" packages, believing them to be complainant's "Gold Dust" soap powder. We see no reason to doubt the truth of this testimony. Defendant is a manufacturer, and sells only to the trade. By its salesmen it offers its soap powder in competition with complainant's, as an article equal or superior thereto, and at a less price. Undoubtedly, no one who bought from defendant was ever deceived. No effort was ever made to delude the trade into the belief that defendant's salesmen were selling complainant's goods. But equity regards the consumer as well as the middleman. It is to him, more than to the jobber or wholesale purchaser, that the various indicia of origin with which merchants dress up their goods appeal; and courts will not tolerate a deception devised to delude the consuming purchaser by simulating some well-known and popular style of package. When we survey the entire field of the soap-powder trade, as it is illustrated by the exhibits of packages in use in 1892, and note particularly the complainant's package, the defendant's original "Soapona" package, and its modified or "Buffalo" package, it seems impossible for any intelligent mind to escape the conviction that the new form of package was devised with a clear intent to simulate to a greater or less extent the complainant's package. The changes from the Soapona package to the Buffalo are numerous and extensive, and, except for the name, there is not a single one of them which has not been an approach towards the complainant's device. The circumstance that, out of something like a half score of changes, every one is in the same direction, and not one in the multitudinous other directions which were open to choice, is, to our minds at least, conclusive evidence of design. Such things do not happen by chance. In thus approaching the complainant's style of package, however, the designer has been careful with each change to stop short of identity, except in the matter of color. In consequence it has been easier to point out specific differences than to show specific likenesses. And this circumstance had great weight with the circuit court, as is evident from the opinion. After the statement, undoubtedly sound, that complainant cannot have a monopoly of the size and shape of the package in which powder is sold, the court proceeds:

"By a process of exclusion, it will be manifest that the only ground of complaint against the defendant is that it covers the packages with a paper dark yellow in color. When reduced to its last anaylsis this must be the sum and substance of the accusation. At no other point can the complainant fault the defendant. If, for instance, the defendant had chosen pink or white as the color for its packages, leaving them in other respects precisely as they are to-day, it is clear that there would be no cause of action."

· Referring to this last sentence, and accepting it as a correct statement, it may, with equal correctness be said that:

"If defendant had chosen the dark yellow of complainant as the color for its new packages, which it did; if it had even adopted black letters, as being more readily distinguishable on a yellow ground, which it did; if it had also changed the name from 'Soapona' to 'Buffalo Soap Powder,' which it did,—and had left its original four-pound package in all other respects unchanged, it is clear that · there would be no cause of action."

Color, undoubtedly, is a most important element in all package combinations; but there are other elements as well, which go to make up the entire combination. Because a total change of color would so change the general appearance as to destroy resemblance to another package, it by no means follows that color alone would be sufficient to produce a general appearance resembling another package. It would not be giving the complainant a monopoly of yellow to restrain the sale of a particular yellow package, where, in addition to the color, a number of other elements, each differing more or less from its analogue in complainant's package, had been so collocated together as to produce a general appearance calculated to delude the unwary purchaser. The "Kirkoline" above referred to is put up in a yellow package; but such package is not a simulation of complainant's, since it lacks the collocation of other elements which, manifestly, must be superadded to the yellow paper in order to produce a general appearance which would be calculated to deceive.

Although, as was said above, we are satisfied that defendant's new form of package was devised with an intent to produce a package resembling complainant's, the continued use of such package should not be enjoined unless the similarity between the two is of a character "to convey a false impression to the public mind, * * * and to mislead and deceive the ordinary purchaser." McLean v. Fleming, supra. There is no confusion possible in the names of the articles, and defendant has inscribed its own name, "Buffalo Soap Powder," in bold letters, easy to read. The judge who heard the ·cause in the circuit court was strong in the conviction that there was not a similarity calculated to mislead or deceive any buyer of ordinary prudence, that there was no danger of imposition upon any except idiots, and that people who have eyes, ears, and common sense could not be beguiled by any similarity between the packages. We are unable to reach the same conclusion. When it is borne in mind that articles of this kind, when once they are generally known, become associated ·in the public mind with the general appearance of the packages which contain them,—with the dress, rather than · the name,—and that the ordinary retail purchaser of soap powder for consumption is not usually of a high degree of intelligence, and has never had the experience of an equity judge in analyzing the elements which make up the general appearance of a package, it is quite conceivable that a dishonest retail dealer, who kept complainant's and defendant's packages mingled together on the same shelves, some exhibiting the front panel and others the side panels to public view, might easily palm off the one for the other upon an unsus-

pecting purchaser exercising the ordinary care which is to be expected of buyers of soap powder for consumption.

It may fairly be assumed that the individual who designed defendant's yellow and black package was an expert, familiar with the trade; that the changes he made in the old package were all in the direction of complainant's package is manifest; that he was intelligent enough to make such changes in order to accomplish a definite object will surely not be disputed; and that such object was the production of a package resembling complainant's is the irresistible inference. Business men of ordinary acuteness, who wish to establish a distinctive reputation for their goods with the general public, who seek to have such goods so arrayed that they will always be unmistakably recognized by the public, certainly do not begin by assimilating the elements of their design to those of some one competing manufacturer. When they are found doing this, it must be assumed that, for some reason or other, they prefer to have their goods arrayed, not in a distinctive dress, but in one resembling their competitor's; and, when it appears that such competitor has expended upward of $300,000 in advertising his packages, that reason is not hard to find. The actions of defendant's own officers are to our minds strong evidence that, in their opinion as experts, their new black and yellow package was one likely to become confused in the minds of the public with the existing well-known package of complainant. Men act from motives, and, unless the new style of package was devised for this very purpose, no motive for its creation is shown in the record, or in any wise suggested. That it was the result of a fortuitous aggregation of elements is an hypothesis which cannot for one moment be entertained. It was designed by an intelligent creator, and, so far as we can see, for but a single purpose, and that purpose a species of competition in trade which courts of equity hold to be unfair.

We are not left to inferences, however, to determine whether that purpose has been accomplished. In many cases, where simulation is plain, injunctions have been issued without proof of specific instances of deception. Such evidence, however, is always competent, and often illuminative. In the case at bar there is evidence of several instances where purchasers asking for "Gold Dust" have had defendant's soap powder palmed off on them, being deceived by the general appearance of the package. More persuasive, however, is the evidence of retail dealers who buy from defendant and sell to the consumer. It is the testimony of experts. One of them, a grocer in Wilkes Barre, Pa., testifies that defendant's salesman, as an inducement to purchase, called his attention to the similarity of the packages, and the possibility of passing off one for the other. The salesman contradicts this statement, and we give no weight to it; but the grocer further testifies that he perceived the resemblance, bought the defendant's soap powder, and has repeatedly passed it off on customers who asked for "Gold Dust." Another grocer, who keeps both kinds of powder, testified that he has often substituted one for the other, since there is more money for him in selling the defendant's at the same retail price, as it costs 25 per cent. less at

wholesale; that, when customers asked for Gold Dust, he would generally go to the shelves, and hand them defendant's soap powder; that some customers were not deceived, but that the packages resemble each other so closely that a dealer can repeatedly, in most cases, substitute one for the other; and that he has known personally of many such cases. Still another witness, who had been handling complainant's powder for several years, testified:

"About a year ago I purchased a lot of Buffalo soap powder, manufactured by defendants, at a less cost than I paid for Gold Dust washing powder, with the intention of substituting the Buffalo soap powder for the Gold Dust washing powder, thereby increasing my profit; the packages being so similar in appearance that an ordinary purchaser could not tell the difference. I further state that my own candid opinion is that at least two-thirds of the Buffalo soap powder sold in my store was taken by my customers believing that they had the Gold Dust washing powder."

None of this evidence is shaken by cross-examination. It may be conceded that the defendant never, by any of its officers or agents, intimated to its salesmen that they should recommend the defendant's packages as being readily disposed of to consumers who asked for and wished to have complainant's. But such oral commendation was certainly unnecessary. A survey of the two packages placed side by side would sufficiently suggest this possibility to a dishonest dealer. We have, then, the case of a manufacturer who is careful always to sell its goods as its own, but who puts them up in a style of package so similar to that used by one of its competitors, earlier in the market, that unscrupulous dealers, who purchase from the manufacturer in order to sell at retail to consumers, are enabled to delude a large number of such retail purchasers by palming off upon them the goods of the manufacturer as those of its competitor. That this is unfair competition seems apparent, both on reason and authority. In a similar case the court says:

"It is argued that the defendant has nothing to do with the deception of the public. The answer is obvious. Every person who, intending to buy a bottle of the plaintiff's sauce, gets, instead, a bottle of the defendant's, is a customer taken from the plaintiff by this deceit; and, if this is extensively done, the damage to the plaintiff's trade would be serious." Powell v. Brewing Co. [1896] Ch. 88.

See, also, Read v. Richardson, 45 Law T. (N. S.) 54; Brown v. Mercer, 37 N. Y. Super. Ct. 265; Singer Manuf'g Co. v. Loog, 18 Ch. Div. 412; and Lever v. Goodwin, 36 Ch. Div. 1.

In the latter case the rule is well stated as follows:

"It has been said more than once in this case that the manufacturer ought not to be held liable for the fraud of the ultimate seller; that is, the shopkeeper or the shopkeeper's assistant. But that is not the true view of the case. The question is whether the defendants have or have not knowingly put into the hands of the retail dealers the means of deceiving the ultimate purchasers."

The decree of the circuit court is reversed, with costs, and the cause remanded to that court with instructions to enter a decree in accordance with this opinion. Injunction should issue against putting up and selling or offering for sale "the particular form of package which has been referred to in the bill and put in evidence as 'Defendant's Second Package,' or any other form of package which shall, by reason of the collocation of size, shape, colors, lettering,

spacing, and ornamentation, present a general appearance as closely resembling the 'Complainant's Package,' referred to in the bill and marked in evidence, as does the said 'Defendant's Second Package.'" This would seem to be sufficient; but, since so much has been said about the impossibility of framing any decree which would prevent the sale of the package complained of, and yet not give complainant the monopoly of yellow paper for its wrappers, the following clause may be added: "This injunction shall not be construed as restraining defendant from selling packages of the size, weight, and shape of complainant's package, nor from using the designation 'Buffalo Soap Powder,' nor from making a powder having the appearance of complainant's 'Gold Dust,' nor from using paper of a yellow color as wrappers for its packages, provided such packages are so differentiated in general appearance from said 'Complainant's Package' that they are not calculated to deceive the ordinary purchaser."