HAROLD F. RITCHIE, INC., Plaintiff-Appellant,

v.

CHESEBROUGH-POND'S, INC., Defendant-Appellee.

No. 297, Docket 25961.

United States Court of Appeals
Second Circuit.

Argued April 14, 1960.

Decided July 29, 1960.

756

Townley, Updike, Carter & Rodgers, New York City, for appellant; Stuart N. Updike and Walter E. Shuttleworth, New York City, of counsel.

White & Case, New York City, for appellee; Thomas Kiernan, James A. Smyth, Edmund Dill Scotti and Ernest A. Fintel, New York City, of counsel.

Before SWAN, CLARK and FRIEND-LY, Circuit Judges.

SWAN, Circuit Judge.

On June 25, 1957 Harold F. Ritchie, Inc., a New Jersey corporation and owner of the registered trademark "Brylcreem," brought suit against Chesebrough-Pond's, Inc., a New York corporation, charging trademark infringement and unfair competition by appellee's use of the trademark "Valcream." The complaint sought injunctive relief pursuant to 15 U.S.C.A. § 1116, and an accounting of profits, treble damages and costs pursuant to 15 U.S.C.A. § 1117. Federal

jurisdiction was based on the Lanham Act, 15 U.S.C.A. §§ 1114, 1121, with pendent jurisdiction of the claim of unfair competition, 28 U.S.C.A. § 1338(b), and also on diverse citizenship, 28 U.S.C.A. § 1332. The trademarks, Brylcreem and Valcream, were employed to designate cream hairdressing for men which is marketed in collapsible metal tubes packaged in paperboard cartons.[1] The case was tried before Chief Judge Ryan without a jury. Pursuant to his opinion of September 14, 1959, reported in 176 F.Supp. 429, judgment was entered dismissing appellant's action. The court found no such similarity between "Valcream" and "Brylcreem" as to cause likelihood of confusion to purchasers, and concluded that appellant had not sustained the burden of proving either trademark infringement or unfair competition. Timely notice of appeal was duly filed.

The appeal asserts that the trial court erred (1) in failing to give recognition to the legal principles applicable to a second comer in the field of competition, (2) in failing to find as a fact that the appellee intentionally imitated plaintiff's trademark, (3) in the treatment accorded the evidence of actual confusion, and (4) in dismissing the claim of unfair competition.

■ By way of introduction to its argument appellant contends that this court is in as good a position as the trial judge to determine likelihood of confusion. This same contention was advanced in our recent decision in J. R. Wood & Sons v. Reese Jewelry Corp., 2 Cir., 1960, 278 F.2d 157, 158. There a finding of infringement was reversed, this court saying: "The decision as to infringement must, of necessity, be based primarily upon a comparison of the marks. In the absence of other determinative evidence, a question of law or at best a mix-

ed question of law and fact is presented as to which appellate review is not foreclosed." Where an appellant's argument is predicated upon the similarity of the trademarks themselves, this court has held that " * * * we are in as good a position as the trial judge to determine the probability of confusion." Miles Shoes, Inc. v. R. H. Macy & Co., Inc., 2 Cir., 199 F.2d 602; Eastern Wine Corp. v. Winslow-Warren, Ltd., 2 Cir. 137 F. 2d 955, 960, certiorari denied 320 U.S. 758, 64 S.Ct. 65, 88 L.Ed. 452.

■ There is no dispute that appellant had a valid registered trademark; the only issue is whether appellee's conduct infringed the trademark or constituted unfair competition. Each case alleging trademark infringement must be judged on its own facts, and citation of authorities is not very helpful, except insofar as they show the general pattern. LaTouraine Coffee Co., Inc. v. Lorraine Coffee Co., Inc., 2 Cir., 157 F.2d 115, 117, certiorari denied 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663; Q-Tips, Inc. v. Johnson & Johnson, 3 Cir., 206 F.2d 144, 147.

■ Beginning in 1942 appellant, and its predecessors in title, have sold the "Brylcreem" product in the United States and Canada, and in recent years appellant has been an acknowledged leader in the sale of men's cream style hairdressing packaged in tubes contained in paperboard cartons. Appellant has spent very large sums in advertising; its share of the United States market has increased from 2.6% in 1953 to 11.9% in 1958. In 1914 appellee began selling in bottles "Vaseline Hair Tonic," a clear liquid, and much later, in 1947, "Vaseline Cream Hair Tonic," a milky white liquid. In 1955 appellee decided to manufacture and sell on the United States market a men's cream style hairdressing in tubes. This decision was due to the increasing popularity of this type of product and was

1. Appellant's trademark was registered on November 3, 1942, as No. 398,474. Appellant also owns a New York State Registration of the trademark "Brylcreem." Appellee applied to the Patent Office for registration of the trademark "Val-

cream." Appellant opposed the registration and, after correspondence between the parties, brought the present suit, in consequence of which the Patent Office proceeding has not been decided.

made after a thorough study of this new market created by "Brylcreem." When appellee entered that market with test sales in August 1956, and nationally by April 1957, it was obviously a second comer to appellant.[2]

In this circuit and others, numerous decisions have recognized that the second comer has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer.[3] This principle is well illustrated by G. D. Searle & Co. v. Chas. Pfizer & Co., Inc., 7 Cir., 265 F.2d 385, 387, certiorari denied 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65, which held the trademark "Dramamine" was infringed by "Bonamine," each designating a remedy for motion sickness. At page 387, quoting verbatim from an earlier decision of the Seventh Circuit, the court said:

"One entering a field of endeavor already occupied by another should, in the selection of a trade name or trademark, keep far enough away to avoid all possible confusion."

It is permissible in the American competitive economy for the second comer to endeavor to capture as much of the first comer's market as he can. He must do this, however, by giving his product a name and dress descriptive and fanciful in its own right and selling it on its own merit, not by confusing the public into mistakenly purchasing his product for his competitor's. The second comer must create a reputation of its own and not trade on the goodwill of another product already established at considerable cost and risk.

In this regard the law today is much the same as it was fifty years ago, when this court said in Florence Mfg. Co. v. J. C. Dowd & Co., 2 Cir., 178 F. 73, 75:

"It is so easy for the honest business man, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of his competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them."

Important in determining whether the second comer's entrance into the market creates possible confusion, is any evidence of conscious imitation of the first comer's product.[4] It has often

2. Appellee advances the extraordinary contention, unsupported by any citation of authority, that because appellant, in January 1959, changed somewhat the color arrangement and appearance of the "Brylcreem" tubes and cartons it was using when the suit was commenced in June 1957, appellant thereby "became the late or second comer" and "abandoned its claim for unfair competition based on alleged similarity of the parties' cartons and tubes when this action started." Appellant's answer to this contention is obviously correct, namely, that the only effect, if any, which appellant's voluntary change in the appearance of its packaging can have, relates to the damages recoverable after such change, and has no bearing on the question of trademark infringement or unfair competition prior to such change.

3. 15 U.S.C.A. § 1114(1) imposes liability for use of a colorable imitation of any registered mark if such use "is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods * * *." See J. R. Wood & Sons, Inc. v. Reese Jewelry Corp., 2 Cir., 1960, 278 F.2d 157; Florence Mfg. Co. v. J. C. Dowd & Co., 2 Cir., 178 F. 73, 75; American Chicle Co. v. Topps Chewing Gum, Inc., 2 Cir., 208 F.2d 560, 563; Q-Tips, Inc. v. Johnson & Johnson, 3 Cir., 206 F.2d 144, 147; Northam Warren Corp. v. Universal Cosmetic Co., 7 Cir., 18 F.2d 774, 775.

4. Brylcreem had not acquired such a generic meaning in the public eye as to necessitate imitation of its name by a newcomer in the field. This is evidenced by the success of other products in the field, e.g., Wildroot, Top Brass, Crew Cut and Command.

been recognized that "One of the elements to be considered in deciding whether there is confusing similarity is the intent of the actor who adopts the designation."[5] Appellant contends that the trial court erred in not finding conscious imitation of plaintiff's trademark by defendant's selection of its mark "Valcream." In support of its contention appellant argues (1) that the cumulative absence of differentiation is objective evidence of conscious imitation, and (2) that the evidence concerning appellee's choice of name and its copying of nonfunctional aspects of appellant's product show actual subjective intent to imitate. The trial court in a single sentence rejected this contention saying, "the alleged evidence of conscious imitation is nothing more than advertising jargon and the use of practices which are common, in the business world in general, and in this highly competitive field in particular." We do not think that evidence which shows a cumulative absence of differentiation should be disposed of so summarily.

■ Appellant points out that the two products are identical in the size and shape of the tubes and cartons, the prices identical,[6] the colors similar, the orifice identical in size, and the advertising on the tubes and packages substantially the same. Moreover the contents of the tubes are indistinguishable. They look, feel and smell the same; and their ingredients are concededly virtually identical. As to each of these items appellant admits it had no monopoly, but it contends, and we agree, that the multiplicity of the similarities is objective evidence of defendant's conscious imitation of plaintiff's product.

Even of more significance than the so-called "objective" evidence of intent is the "subjective" evidence of which the proof was largely documentary. Having decided to market a cream style hairdressing in tubes, defendant asked an advertising agency to suggest names for this hairdressing "of the Brylcreem Type," emphasizing that need for a name was of "top priority." Exh. 65. The agency responded with a list of 25 names for "Bryl Cream Type." Exh. 58. From this list the appellee picked Valcreem, one of the two names on the list which most closely approximated appellant's trademark.[7] Other exhibits (66, 67, 68, 69 and 70) show that up to January 5, 1956, defendant intended to use the suffix "creem." Why or when the determination was made to change "creem" to "cream" can only be surmised. A memorandum in November 1955 from appellee's file reveals that the successful market "pioneering" by "Brylcreem" was a compelling reason for appellee's choice of the name "Valcreem." Exh. 94. The similarities between the original Brylcreem tube and the Valcream tube are accounted for by the fact that when the artist was summoned to design the Valcream tube, there was a tube of Brylcreem on the desk in front of him. Joint Appendix 125. When it came to devising the instructions for use and the statement of ingredients on the outside of defendant's carton, the advertising agency was sent a carton of "Brylcreem" as an aid in composing a "like panel on Valcream." Exh. 87. Even the color of the cap was made red, conforming with Brylcreem, when the question arose whether to make it red or white. Exh. 78. Before marketing Valcream, appellee ran a series of "blind product tests" by

5. Quoted from Q-Tips, Inc. v. Johnson & Johnson, 3 Cir., 206 F.2d 144, 147 ("Q-Tips" held infringed by "Cotton Tips"). See also G. D. Searle & Co. v. Chas. Pfizer & Co., Inc., 7 Cir., 265 F.2d 385, 389, certiorari denied 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65 ("Dramamine" held infringed by "Bonamine"); Western Oil Refining Co. v. Jones, 6 Cir., 27 F.2d 205, 206 ("Silver Flash" held infringed by "Super-Flash").

6. Brylcreem was the only competitor marketed at retail at 39¢ and 59¢ respectively, when defendant picked the exact prices for which Brylcreem was selling, 39¢ and 59¢, respectively.

7. The other name on the list which along with Valcreem most closely approximated appellant's trademark was Palcreem.

which it was learned that "34% * * * saw no difference between Brylcreem and Valcream * * *. While the sample was too small to be definitive in preferences this close, it would appear, at most, that any superiority of Brylcreem would probably be no more than 1% point over Valcream, if any." Exh. 86; see exhs. 89 and 90. In making such tests, defendant consumed five hunderd and fifty 1¾ ounce tubes of Brylcreem. Exh. 80.

 In our opinion the above evidence of intentional imitation was not given adequate consideration by the court below. Doubtless the trial court's summary rejection of this evidence was due to the court's finding of no confusing similarity between the two trademarks standing alone.[8] We think the District Court should have considered the names of the two products in conjunction with the similarity of the presentation of the products with respect to their design and general appearance, containers, tubes, price, size, perfume, and other non-functional aspects. In My-T-Fine Corp. v. Samuels, 2 Cir., 69 F.2d 76, 77, Judge Learned Hand said:

"* * *; a latecomer who deliberately copies the dress of his competitors already in the field, must at least prove that his effort has been futile. Prima facie the court will treat his opinion so disclosed as expert and will not assume that it was erroneous [citing cases]. He may indeed succeed in showing that it was; that, however bad his purpose, it will fail in execution; if he does, he will win. Kann v. Diamond Steel Co., 89 F. 706, 713 (C.C.A. 8). But such an intent raises a presumption that customers will be deceived."[9]

 Admittedly there is nothing to prevent a second comer from making and selling the identical product of the first comer, providing the second comer so names and dresses its product as to avoid all likely confusion.[10] Clearly this test has not been met. This is true not

8. Much significance was attached by the District Court to the fact that the second syllable was descriptive or generic. Even assuming *arguendo* the premise as to the dissimilarity of the prefixes standing by themselves, dissimilar prefixes combined with generic or descriptive suffixes have often been found to infringe. Q-Tips, Inc. v. Johnson & Johnson, 3 Cir., 206 F.2d 144 ("Cotton" held to infringe "Q" when both combined with "tips"); Western Oil Refining Co. v. Jones, 6 Cir., 27 F.2d 205 ("Silver" held to infringe "Super" when both combined with "Flash"); Florence Mfg. Co. v. J. C. Dowd & Co., 2 Cir., 178 F. 73 ("Sta" held to infringe "Keep" when both combined with "Clean"). See discussion in G. D. Searle & Co. v. Chas. Pfizer & Co., Inc., 7 Cir., 265 F.2d 385, 388–389, certiorari denied 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65. The language in G. D. Searle at page 387 is almost identically applicable to the present case: "Dramamine and Bonamine contain the same number of syllables; they have the same stress pattern, with primary accent on the first syllable and secondary accent on the third; the last two syllables of Dramamine and Bonamine are identical. The initial sounds of Dramamine and Bonamine ('d' and 'b') are both what are known as 'voiced plosives' and are acoustically similar * * *. The only dissimilar sound in the two trademarks is the 'r' in Dramamine. Slight differences in the sound of similar trademarks will not protect the infringer."

9. For other Second Circuit cases to the same effect, see Best & Co. v. Miller, 167 F.2d 374, 377, certiorari denied 335 U.S. 818, 69 S.Ct. 39, 93 L.Ed. 373 (dictum); Miles Shoes, Inc. v. R. H. Macy & Co., Inc., 199 F.2d 602, 603; American Chicle Co. v. Topps Chewing Gum, Inc., 208 F.2d 560, 562; Mastercrafters C. & R. Co. v. Vacheron & Const.-Le C. W., 221 F.2d 464, 467, certiorari denied 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743.

10. See Upjohn Co. v. Schwartz, 2 Cir., 246 F.2d 254, 256, where this court said: "The defendant could put up his drug preparations, using the same formula and even the same size and color for his capsules and tablets, if he took adequate precautions to prevent the substitution of his products for plaintiff's, a result that was likely to happen due to the close similarity of the two products, and if he did not resort to any deceitful practices." See also footnote 3 and related text.

only because of the conscious imitation referred to above, but also because as a result of the similarity of name and dress, actual confusion did occur.

The Gil Hodges television broadcast provided one source of evidence of confusion which is briefly summarized in the District Court opinion.[11] Appellee made an offer by television in certain west coast cities to refund purchasers of the 59¢ size of Valcream with a check for that sum signed by the baseball player Gil Hodges. This evidence included thirteen instances in which Brylcreem cartons were mailed to appellant in response to appellee's television commercial.[12] Appellee also received at least ten, and probably more Brylcreem cartons in response to its offer. There was no evidence of the receipt of cartons of any other competing hairdressing. Another source of evidence was the testimony of the department manager in charge of cosmetics in the Katz Drug Store in Des Moines, Iowa, and the depositions of two employees of Katz Drug Store in Kansas City, Missouri.[13] Two additional instances of confusion were also proved. The Oklahoma Drug Sales Company of Lawton, Oklahoma, mistakenly invoiced appellant for Valcream advertising in a local paper; and Dakota Drug, Inc., of Minot, North Dakota, sent appellant a letter relating to a price reduction offer made by appellee for Valcream.[14] Even Standard & Poor's somehow transposed the two names and attributed the product Brylcreem to the appellee corporation.[15]

 The court brushed aside this evidence with the statement: "The evidence of actual confusion introduced at the trial was hardly overwhelming. Most of the deposition and oral testimony, as we have observed, showed not confusion but carelessness and inattention on the part of the purchaser." In our opinion this statement by the trial judge is not a finding of fact based on testimony but is merely a characterization of the testimony embodying the judge's view as to what "confusion" is. In denying significance to the evidence of actual confusion we think the court erred. Confusion on the part of the careless or inattentive purchaser may not be disregarded. As this court said in American Chicle Co. v. Topps Chewing Gum, Inc., 2 Cir., 208 F.2d 560, 563:

"* * * the first comer's careless customers are as valuable to him as any others; and their carelessness can hardly be charged to him. Why they should be deemed more legitimate game for a poacher than his careful buyers, it is hard to see, unless it be on the ground that he should have made his mark so conspicuous that it would serve to hold even the most heedless. Surely that is an inadequate defense. We are not committed to [that] doctrine in this circuit."

Actual confusion or deception of purchasers is not essential to a finding of trademark infringement or unfair competition,[16] it being recognized that "reliable evidence of actual instances of confusion is practically almost impossible to secure."[17] But where such proof has been adduced, weight should be given

---

11. 176 F.Supp. 429, at page 431.

12. Letters accompanying these cartons are set forth in Exh. 43.

13. Exh. 36. Appellee contended that this evidence was inadmissible hearsay. Such testimony, however, falls into the category of exceptions to the hearsay rule which exempts statements as to mental condition. 6 Wigmore § 1714.

14. Exhs. 32 and 33.

15. Exh. 34. The author of the article testified that this was merely a careless mistake in transposing the names.

16. Mastercrafters C. & R. Co. v. Vacheron & Const.-Le C. W., 2 Cir., 221 F. 2d 464, 466, certiorari denied 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743; G. D. Searle & Co. v. Chas. Pfizer & Co., 7 Cir., 231 F.2d 316, 317.

17. Miles Shoes, Inc. v. R. H. Macy & Co., Inc., 2 Cir., 199 F.2d 602, 603.

it.[18] Here the evidence is impressive in view of its spontaneous character and difficulty of attainment.

■ Moreover, it is difficult to understand on what basis the court found that customers who were confused were careless or inattentive. None of such customers was produced as a witness at the trial. While a side by side comparison of the trademarks, tubes and cartons would enable an attentive observer to differentiate them, this is not the test to be applied.[19] It is the general overall impression which counts; we find no body of opinion in this circuit or elsewhere, to the contrary.

Since we find infringement of the Brylcreem trademark, it is unnecessary to consider the allegation of unfair competition, which is governed essentially by the same principles already discussed.

For the foregoing reasons we believe the trial court erred in dismissing the action. Accordingly, the judgment is reversed and the case remanded for further proceedings not inconsistent with this opinion.

It is so ordered.

CLARK, Circuit Judge (dissenting).

In a recent series of carefully formulated and reasoned opinions this court has declined to extend the trade-mark monopoly to prohibit the competitive use of well-known and ordinary English words. J. R. Wood & Sons v. Reese Jewelry Corp., 2 Cir., 278 F.2d 157; Avon Shoe Co. v. David Crystal, Inc., 2 Cir., 279 F.2d 607; Speedry Products, Inc. v. Dri Mark Products, Inc., 2 Cir., 271 F.2d 646; Dawn Donut Co. v. Hart's Food Stores, 2 Cir., 267 F.2d 358; Kitchens of Sara Lee, Inc. v. Nifty Foods Corp., 2 Cir., 266 F.2d 541; Warner Bros.

Co. v. Jantzen, Inc., 2 Cir., 249 F.2d 353; and see also Norwich Pharmacal Co. v. Sterling Drug, Inc., 2 Cir., 271 F.2d 569, certiorari denied 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739; and the classic earlier cases of Eastern Wine Corp. v. Winslow-Warren, Ltd., 2 Cir., 137 F.2d 955, certiorari denied 320 U.S. 758, 64 S.Ct. 65, 88 L.Ed. 452, and G. B. Kent & Sons, Ltd. v. P. Lorillard Co., D.C.S.D.N.Y., 114 F.Supp. 621, affirmed 2 Cir, 210 F.2d 953. My brothers avoid this body of recent opinion by the convenient device of ignoring it. But so many and so close are the precedents as necessarily to suggest that Chief Judge Ryan was, on strong grounds in denying relief below in his very fully analyzed opinion, D.C.S.D. N.Y., 176 F.Supp. 429, and that reversal comes because of the differing composition of the sitting panel.

Now I recognize the exigencies of decision to find actionable similarity or its absence in trade name cases where the final test, after all, must usually be the trier's subjective reaction to the looks of the competing names on inspection. So it is but natural that the precedents may seem diverse or inconsistent; perhaps judicial uncertainty here is not wholly without its value as a stimulus or goad to the "American Way" of free competition. And for myself, I certainly do not claim any special degree of consistency, which is so impossible of attainment here. But I do suggest that there are certain desirable ground rules which ought to limit somewhat the area of doubt where applicable. Perhaps the most important presently in issue is the admonition against discovering actionable similarity only through the use of a word already in the public domain. Here quite obviously the prefix "Val" is wholly unlike the combination of harsh conso-

18. N. K. Fairbank Co. v. R. W. Bell Mfg. Co., 2 Cir., 77 F. 869, 877; Esso, Inc. v. Standard Oil Co., 8 Cir., 98 F.2d 1, 5.

19. Coca-Cola Co. v. Chero-Cola Co., 51 App.D.C. 27, 273 F. 755; G. D. Searle & Co. v. Chas. Pfizer & Co., Inc., 7 Cir., 265 F.2d 385, certiorari denied 361 U.S. 819, 80 S.Ct. 64. This is especially true where inexpensive products are involved, since the normal buyer does not exercise as much caution in buying an inexpensive article as he would for a more expensive one, making confusion more likely. L. J. Mueller Furnace Co. v. United Conditioning Corp., 222 F.2d 755, 42 CC PA 932.

nants "Bryl"; only when we add the simple word "cream" (or even more strangely, plaintiff's corrupted form "creem") is there a semblance of infringement. This is to make a plus, a unique plus, of infringement from two zeros of noninfringement; for separately the two parts of the words cannot justify action. For this bases the monopoly upon a common and highly useful word whose use is not properly to be limited to such exclusive exploitation.

The principle is aptly illustrated by our recent case essentially on all fours with the one here, J. R. Wood & Sons v. Reese Jewelry Corp., supra, 2 Cir., 278 F.2d 157, 159. There in holding that the trade-mark "Artcarved" for wedding and engagement rings was not infringed by the defendant's mark "Art ◆ Crest,"

Judge Moore pointed out that both marks used as a first syllable a word in common use, i. e., "art." He continued: "Trademarks containing a word in the public domain are said to be less 'confusingly similar if they resemble each other only by the inclusion of a word which is in the public domain.' [Citing Goldring, Inc. v. Town-Moore, Inc., 228 F.2d 254, 255, 43 CCPA 740, and other cases.] * * * To grant to appellee the protection sought would bestow upon it a virtual monopoly of any word commencing with 'art.' " Citing Warner Bros. Co. v. Jantzen, Inc., supra, 2 Cir., 249 F.2d 353, and Eastern Wine Corp. v. Winslow-Warren, Ltd., supra, 2 Cir., 137 F.2d 955,

certiorari denied 320 U.S. 758, 64 S.Ct. 65, 88 L.Ed. 452.[1]

As a matter of fact the present case affords an even more apt illustration of the principle. For the word "art" is one of convenient generality, even ambiguity, as applied to high-grade rings, whereas "cream" is both more ordinary and more precisely descriptive of the product here. So the simple and unoriginal mixture here of white oil and beeswax, with a "citrus" perfume, does produce a product not to be conveniently described by some other dictionary substitute, such as "cosmetic" or "emulsion." And thus even without the added distinction afforded by the plaintiff's spelling of "creem," I should think it clear that no actionable confusion could be attributed to defendant's name, and that affirmance was required. While I shall advert to other considerations, all else does seem to me but gilding the lily.

But further it would seem that the court must view the competitive market here involved realistically and in the light of the plethora of hair creams and other cosmetics distributed everywhere in the ubiquitous collapsible tube. Here we have an inexpensive nonsecret hairdressing, built upon millions spent in advertising,[2] but having after all to compete with countless other similar cream products; while it is entitled to protection of its own name, it cannot claim uniqueness among creams as such or hold this defendant to standards unrealistic in

1. For other cases applying this principle, see Coca-Cola Co. v. Carlisle Bottling Works, D.C.E.D.Ky., 43 F.2d 101, 114, affirmed 6 Cir., 43 F.2d 119, certiorari denied 282 U.S. 882, 51 S.Ct. 86, 75 L. Ed. 778; Glenmore Distilleries Co. v. National Distillers Products Corp., 4 Cir., 101 F.2d 479, certiorari denied 307 U.S. 632, 59 S.Ct. 835, 83 L.Ed. 1515; Pennzoil Co. v. Crown Central Petroleum Corp., D.C.Md., 50 F.Supp. 891, 898, affirmed 4 Cir., 140 F.2d 387, certiorari denied 322 U.S. 750, 64 S.Ct. 1261, 88 L.Ed. 1581. These cases also stress the dominating importance, to show dissimilarity, of the first syllable or word in a combination or composite term. See al-

so Smith v. Tobacco By-Products & Chemical Corp., 243 F.2d 188, 44 CC PA 880; Lauritzen & Co. v. Borden Co., 239 F.2d 405, 44 CCPA 720; Crown Overall Mfg. Co. v. Chahin, 5 Cir., 200 F.2d 935.

2. Plaintiff says in its brief that its "annual sales since 1953 have shown a pattern of direct and consistent relationship to the amount of advertising expense. Thus, during the period 1953–1958, plaintiff moved from 2.6% of the total hairdressing market in the U. S. * * * to 11.9%." And its advertising expense went up from $696,800 for the fiscal year 1953 to $2,219,800 for 1957.

the trade. See 3 Restatement, Torts § 729(c) and (d) and comment *g* (1938). Plaintiff, making a virtue of necessity, claims greater protection because "inexpensive products are more likely to be confused than expensive ones," but concedes other registrations of "cream" marks to be valid. Hence the question comes back again to the supposed similarity of "Val" to "Bryl" as applied to a cream; but it is not readily apparent why that is closer than other combinations. Thus defendant showed some twenty registrations by the Patent Office of various composite marks containing the descriptive word "cream" or a misspelling thereof. It is hard to see a differentiation not here present supporting such composites as "Milcream," "Glo-Cream," "Lavocream," "Lashcreme," "Ecccream," and "Pearl Cream." Such composites of cream, such as the presently popular "creme" or "kreme," are most usual nowadays in hair shampoos, dressings, and cleansing creams, not to speak of the closely allied dental creams and shaving creams;[3] it is a rare medicine closet nowadays which will not have various tubes of "cream." I suggest with deference that if my brothers are now starting on the road to afford special protection to this name, they will find it a long and hazardous, if not an impossible, one. For they are according an all-pervasive uniqueness to plaintiff's name of the kind realistic perhaps with respect to a precision watch or a fine ring, but hardly so with respect to any mere cosmetic cream.

So my brothers' meticulous and labored rehearsing of every advertising detail, including the shape and orifice of the tube, the form of the container, the competitive prices—59¢ and 39¢—seems to be deserving of a better cause. For frankly I cannot see what of value it proves. Admittedly plaintiff has and can claim no monopoly in these trade details; and defendant is entitled to make use of any of them which will aid it in the competitive race. Remember defendant has been in the general cosmetic business longer than the plaintiff, and nothing could be more natural than its attempt to catch up with the plaintiff's advertising success. Much of what is now cited against it to my mind shows on the contrary very considerable concern to make its competition legal and proper. Of course it intended to compete; it would have been wholly disingenuous and dishonest to have claimed it was oblivious of the presently largest distributor in the business. So when it rejected its original word "Valcreem" to spell "cream" properly, I should think its action commendable, rather than the reverse. To say that defendant picked from a long list of possible names laid before it one of the two names which most closely approximated plaintiff's trade-mark is to accept blindly the plaintiff's self-serving asseveration, the truth of which is not apparent on inspection of the 250 or more names set forth. And so as to the much belabored "late-comer" argument, it of course is valid where it is valid, namely, where there is real copying, not where the names are as dissimilar as here. I shall not pause to examine each tidbit of detail, but trust I have set forth enough to explain my own conviction that both the so-called "objective" and "subjective" evidence of intent of itself shows nothing illegal or improper in the competitive battle; on the contrary, it tends to indicate a scrupulous attempt to learn and to observe the proper legal limits.

And that brings me back again to the crucial point of likelihood of confusion as to the source of the competing product. As bearing on the point, plaintiff tried extensively to show evidence of actual

---

3. For example, Consumer Reports 1957 Buying Guide lists some 13 "creams" or "cremes" among hair shampoos. Plaintiff urges a difference in intended use by men or women; but the record suggests no way of testing hair oil for gender, nor do the trade-mark registrations. The same publication lists some 32 cleansing "creams" and becomes quite indefinite as to the number of shaving and dental creams.

consumer confusion, but has had the misfortune to have the distinguished trial judge make findings of fact against it. This, too, presented a serious obstacle to my brothers in reaching the conclusion to which they otherwise felt impelled. There were perhaps two ways in which they might have met this obstacle. One was to ignore it, since we have treated the conclusion as to confusion one of law reviewable by us on appeal. See J. R. Wood & Sons v. Reese Jewelry Corp., supra, 2 Cir., 278 F.2d 157, citing cases.[4] But in view of the obvious difficulties which are impliedly conceded by the very detail of their argument, they were not quite prepared to take so drastic a step. Instead they pursue the opposite course of attempting to denigrate the findings as being either not in accord with the evidence or not true findings or both. I submit, however, that not thus easily may these determinations of the experienced trial judge be pushed aside.

For when we come to examine Chief Judge Ryan's actual findings in detail, we find them amply supported by the record and particularly exemplary because of the tinge of common sense they reflect. Actually the few puny instances of possible or claimed confusion among millions of sales were so scanty as to impel the contrary conclusion. On the basis of plaintiff's gross sales defendant reasonably estimates that plaintiff sold approximately 32,000,000 tubes of its cream during a three-year period, and of course defendant also was making substantial sales. The few isolated instances, summarized by the trial court, D.C.S.D.N.Y., 176 F.Supp. 429, 431, mainly where Brylcreem purchasers tried to cash in on a money-back offer by Valcream on television, are surely not impressive against such a background of sales; indeed, it is interesting to note that, if anything, Brylcreem was the slight gainer from Valcream's television advertising, and there seems an actual dearth of a showing of persons who may have bought the latter for the former. So the judge quite properly said: "Most of the deposition and oral testimony, as we have observed, showed not confusion but carelessness and inattention on the part of the purchaser." D.C.S.D.N.Y., 176 F.Supp. 429, 432, 433.[5] To me these weak trivialities in this vastly overexploited field are anything but impressive —quite the contrary in fact—and they have been correctly appraised by a perceptive trial judge. They are far from demonstrating any real likelihood of confusion within the statutory prohibition, 15 U.S.C. § 1114(1).

In short all roads bring us back to the necessity of seeing some confusing similarity between "Bryl" and "Val." Since I cannot see it, I find no basis for injunctive relief to the plaintiff or for damages and an accounting of "profits." Surely such an accounting will present unusual questions of fair apportionment of award!

I would affirm.

4. Not all circuits agree. See, e.g., Cleo Syrup Corp. v. Coca-Cola Co., 8 Cir., 139 F.2d 416, 417, 418, 150 A.L.R. 1056, certiorari denied 321 U.S. 781, 64 S.Ct. 638, 88 L.Ed. 1074.

5. See the words of Chief Judge McAllister in S. C. Johnson & Son, Inc. v. Johnson, 6 Cir., 266 F.2d 129, 141: "The owner of a trademark is not entitled to a guarantee against confusion in the minds of careless and indifferent buyers, Mishawaka Rubber & Woolen Mfg. Co. v. Panther-Panco Rubber Co., D.C.Mass., 55 F.Supp. 308; and merely occasional cases of confusion or thoughtless errors by very inattentive purchasers are of very little significance in trademark and unfair competition cases. Pennzoil Co. v. Crown Central Petroleum Co., D.C. Md., 50 F.Supp. 891, affirmed 4 Cir., 140 F.2d 387." In accord, see Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 121, 59 S.Ct. 109, 83 L.Ed. 73; Valvoline Oil Co. v. Havoline Oil Co., D.C.S.D.N.Y., 211 F. 189, 194; Quaker Oats Co. v. General Mills, 7 Cir., 134 F.2d 429, 432; 3 Restatement, Torts § 728, comment a (1938).